STATE OF CONNECTICUT *v.* CONNECTICUT
STATE UNIVERSITY ORGANIZATION OF
ADMINISTRATIVE FACULTY, AFSCME,
COUNCIL 4, LOCAL 2836, AFL-CIO
(SC 20628)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker and Alexander, Js.

*Syllabus*

The plaintiff, the state of Connecticut, sought to vacate, and the defendant
union sought to confirm, an arbitration award reinstating the grievant
union member to his employment as the director of student conduct at
a state university. In that position, the grievant was responsible for
enforcing the student code of conduct, and his job duties required him
to investigate violations of that code and to work closely with the student
body, the faculty, and the local police, among others. The grievant's
employment had been terminated in connection with a domestic dispute
involving his wife. On the night of the dispute, the grievant's wife left their
home and called the police, claiming that the grievant had threatened
to kill himself and her, and expressing concern for the safety of their
children, who were still in the home. In response to the police presence
around the home, the grievant called the police department and told
the dispatcher that, although he had guns in the home, he would not
harm law enforcement or his children. The grievant refused to open the
door for the police officers on the scene but was told that he would
receive a call from another police officer, M, and that M would discuss
the grievant's exit from the home and subsequent arrest. After M called

349 Conn. 148 JUNE, 2024 149

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

the grievant, the grievant exited the home and was arrested without incident. Two weeks after the event, the grievant's wife sought and obtained a civil protective order. The Department of Children and Families (DCF) also made a determination that the grievant had physically neglected his children, which was later reversed on appeal as unsubstantiated. In addition, the state had charged the grievant with various criminal offenses, including kidnapping in the first degree and risk of injury to a child, but all of the charges ultimately were dismissed. While the criminal charges and the investigation by DCF were pending, the university conducted its own investigation and subsequently informed the grievant that his employment was being terminated as a result of his off-duty conduct, which, the university contended, rendered him unsuitable to fulfill his professional responsibilities as the university's director of student conduct. The union contested the grievant's discharge, and, pursuant to the parties' collective bargaining agreement, an arbitration hearing was held to determine whether the grievant's dismissal was for just cause and, if not, the appropriate remedy. After hearing testimony from the parties' witnesses, including the grievant and his wife, and after considering other evidence, the arbitrator concluded that the university did not have just cause to terminate the grievant's employment. The arbitrator acknowledged that the case centered on the credibility of the grievant and his wife, both of whom described entirely different versions of the events in question. The arbitrator ultimately found that there was compelling evidence that called into question the wife's version of the events and that the grievant's testimony was credible and corroborated by other evidence in the record. Accordingly, the arbitrator ordered the reinstatement of the grievant to his position of director of student conduct. In its application to vacate the arbitration award, the state contended that the award violated public policy. Specifically, the state claimed that the grievant's reinstatement violated the public trust because his actions, for which he was discharged, had a direct nexus with his professional responsibilities and because his reinstatement would have a detrimental effect on his working relationships with students, faculty, and law enforcement, among others. The trial court rendered judgment granting the state's application to vacate the award and denying the union's motion to confirm the award, from which the union appealed.

*Held* that the state failed to demonstrate that enforcement of the arbitration award reinstating the grievant to his position of director of student conduct violated public policy, and, accordingly, this court reversed the trial court's judgment and remanded the case with direction to grant the union's motion to confirm the award and to deny the state's application to vacate the award:

This court assumed, for purposes of this appeal, that the arbitration award reinstating the grievant implicated the explicit, well-defined, and

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

dominant public polices of protecting victims of domestic violence, protecting children, and preventing interference with or endangering the police, but, after applying the factors enumerated in *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199* (316 Conn. 618), that a reviewing court should consider in evaluating whether an arbitration award reinstating a discharged employee violates public policy, it could not conclude that the award reinstating the grievant in the present case violated those public policies.

With respect to the first factor, there was no statute, regulation, or case law that mandated the termination of the grievant's employment, and, even if this court agreed with the state that the grievant's behavior had violated the university's code of conduct, that code of conduct did not require or recommend the termination of the grievant's employment, and the collective bargaining agreement expressly provided for progressive discipline.

Moreover, even if the grievant's off-duty conduct had violated the strong public policies against domestic violence and in support of cooperation with the police and child safety, a reviewing court must determine, on the basis of the facts found by the arbitrator, only whether any explicit public policy prohibits the arbitration award, that is, the grievant's reinstatement, and no such public policy was identified in the present case.

With respect to the second factor, regarding whether the nature of the employment at issue implicates public safety or the public trust, this court agreed with the state that the grievant occupied a position of public trust, but it could not conclude, in light of the record in the present case, that the grievant's reinstatement would impair the public trust, especially when there was undisputed evidence that other university employees who occupied positions of public trust had been arrested for off-duty conduct and were not subject to termination or even discipline, and the university had failed to present any significant evidence demonstrating why the grievant's off-duty conduct so impaired the public trust that termination of his employment was required.

With respect to the third factor, the factual findings of the arbitrator, which were not subject to judicial review, did not compel this court to conclude that the grievant's off-duty conduct was so egregious that public policy required the termination of his employment.

Specifically, as to the domestic violence charges and the grievant's actions relating to his children, the arbitrator observed that a trial court had dismissed all of the criminal charges against the grievant and that DCF's determination that the grievant had physically neglected his children was reversed on appeal as unsubstantiated, the arbitrator did not credit the allegations of domestic abuse or the wife's claim that the criminal charges had been dropped at her request, and the arbitrator

349 Conn. 148          JUNE, 2024          151

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

found that the grievant's children were asleep and undisturbed during the entire incident.

Although the grievant's actions, as they related to his interference with the police officers, were not to be condoned, the question was not whether the grievant engaged in misconduct but, rather, whether, on the basis of the facts found by the arbitrator, the harms imposed and risked created by the grievant's conduct were so severe that public policy required the termination of his employment, and this court's review of the arbitrator's decision demonstrated that the arbitrator considered the grievant's fears related to the police presence and his concerns for his own safety to be credible and concluded that those fears and concerns served as mitigating factors with respect to the grievant's failure to immediately comply with the instructions of the police during the incident, especially when the grievant ultimately complied with those instructions and surrendered after being assured of his safety by M, and the grievant was not charged with, let alone convicted of, any crimes relating to his interactions with the police.

Furthermore, the state failed to satisfy its burden of establishing that reinstatement of the grievant to his position as the university's director of student conduct would send an unacceptable message to students and other employees of the university, or that the potential impact of the grievant's conduct on individuals who were not parties to the collective bargaining agreement was so negative as to require the termination of his employment, as the university introduced only limited evidence to demonstrate that the incident had any impact on its students and no evidence to support its claim that there would be a negative impact on other employees, whereas the union had presented evidence, which the arbitrator credited, that university employees would not be negatively impacted by the grievant's reinstatement.

In addition, the arbitrator explicitly rejected the university's claim, which the state also raised on appeal, that the grievant's credibility with law enforcement had been seriously undermined as a result of his off-duty conduct, and it was undisputed that that conduct did not occur during the performance of the grievant's official duties but, instead, occurred at the grievant's home and involved a highly personal issue.

With respect to the fourth factor, this court concluded that the grievant was not so incorrigible as to require the termination of his employment, as the arbitrator did not make any finding indicating that the grievant was incorrigible, there was nothing in the record to suggest that the grievant would likely recidivate, and there was evidence that the grievant had successfully completed a therapeutic domestic violence offender program.

(*Two justices dissenting in one opinion*)

Argued November 21, 2022—officially released June 4, 2024

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

*Procedural History*

Application to vacate an arbitration award, brought to the Superior Court in the judicial district of Hartford, where the defendant filed a motion to confirm the award; thereafter, the case was tried to the court, *Hon. Robert B. Shapiro*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment granting the plaintiff's application to vacate and denying the defendant's motion to confirm, from which the defendant appealed. *Reversed*; *judgment directed.*

*Kelly A. Rommel*, for the appellant (defendant).

*Maria C. Rodriguez*, former assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Matthew Larock*, former deputy associate attorney general, for the appellee (plaintiff).

*Opinion*

MULLINS, J. This case presents the question of whether the public policy of this state is violated by an arbitration award ordering the reinstatement of a public sector employee whose employment was terminated after being arrested and charged with crimes involving off-duty conduct. The defendant, the Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO (union), appeals from the judgment of the trial court rendered following the court's denial of the union's motion to confirm an arbitration award that reinstated the grievant,[1] a union member, to his employment at Central Connecticut State University (university). The court denied the union's motion to confirm the award, granted an application

---

[1] In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

to vacate the award filed by the plaintiff, the state of Connecticut (state), and rendered judgment thereon, after concluding that the award violated public policy. We disagree that the arbitration award, which reinstated the grievant, violated an explicit, well-defined and dominant public policy and, therefore, reverse the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of this appeal. At the time of the incident in question, the grievant had been employed by the university as the director of student conduct for approximately fifteen years, and there was no evidence of previous discipline. As the director of student conduct, the grievant was responsible for enforcing the student code of conduct, and, to fulfill his responsibilities, he had to investigate violations of that code. As part of his job duties, he worked closely with the student body, the faculty, the local community, and the local police.

On April 24, 2018, the grievant's wife (wife) called the police and reported that she had left their home after an altercation with the grievant and that she was concerned about the safety of their children, who were still in the home. She told the dispatcher that her husband had threatened to kill her, was going to kill himself, and was " 'drunk.' " When Scott Parker, an officer with the Hartford Police Department, arrived, the wife, dressed in her pajamas and a bathrobe, ran up to him and pointed to her home. She reported that the grievant had grabbed her around the throat, began strangling her, and forced her down the stairs to the basement, where he bound her hands and mouth with duct tape. She later testified that she vomited in the basement as a result of his behavior. Officer Parker indicated in his report that he observed red marks around her neck and scratches on her face, but she declined medical treatment.

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

Officer Parker approached the home and saw the grievant in a second floor window. The grievant called to him, saying, "just come get the kids. I'm not coming out, and I'm not staying in the window." (Internal quotation marks omitted.) In response to the police presence around his home, at 12:12 a.m. on April 25, 2018, the grievant called the Hartford Police Department. During this phone call, he told the dispatcher that he wanted someone to come in to get his children. The grievant told the dispatcher that he had guns in the home but informed the dispatcher, "I will not harm any law enforcement. . . . I will not harm my kids." (Internal quotation marks omitted.) When the dispatcher asked the grievant if he could unload his firearms, the grievant responded, "I cannot." (Internal quotation marks omitted.)

The grievant refused to open the door for the police officers on the scene but told the dispatcher that he was willing to talk to an officer on the scene if the officer would call his cell phone. He then received a call from an officer on the scene, whom he referred to as Chris. He had several conversations with Chris. At 12:31 a.m., Chris told the grievant to " 'sit tight,' " that the grievant would receive a call from Officer Mark Manson, and that Officer Manson would discuss the grievant's exit from the home and subsequent arrest.

At 1:38 a.m., nearly one and one-half hours after the grievant initiated contact with the police, Officer Manson contacted the grievant. The grievant and Officer Manson had numerous conversations. Within one hour, the grievant exited the home and was arrested without incident. The grievant's children were asleep and undisturbed during the entire incident.

The police transported the grievant to the hospital for evaluation, a breath test for alcohol and a drug test. The result of the breath test revealed a blood alcohol content of 0.0 percent, and the result of the drug test

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

was negative. On April 25, 2018, the university placed the grievant on administrative leave, pending an investigation. Two weeks after the incident, the wife sought and obtained a civil protective order for one year. The Department of Children and Families also made a determination of physical neglect against the grievant, which was later reversed as unsubstantiated.

Criminally, the state charged the grievant with one count each of kidnapping in the first degree, strangulation in the first degree, threatening in the second degree, assault in the third degree, and breach of the peace in the second degree, and two counts of risk of injury to a child. All of these charges were ultimately dismissed by the trial court on November 14, 2019, pursuant to an oral motion to dismiss filed by the grievant.

While the criminal charges and the investigation by the Department of Children and Families were pending, the university's chief human resources officer, Anna Suski-Lenczewski, conducted an investigation. In a letter of termination sent to the grievant, Suski-Lenczewski explained: "Your dismissal is for off-duty behavior on the night and early morning of April 24–25, 2018, [that] resulted in a response from the Hartford Police Department and its [e]mergency [r]esponse [t]eam. This behavior created a hazardous situation, placing your spouse, [your] children, police personnel, and yourself at risk [of] grave harm. The seriousness of this misconduct renders you unsuitable to discharge your professional responsibilities as [d]irector of [s]tudent [c]onduct and forms the just cause basis for your termination in accordance with [a]rticle 20.1 of the [collective bargaining agreement between the university and the union]."[2]

_____

[2] The parties' collective bargaining agreement provided in relevant part: "20.1 Discipline of a member under this [a]rticle may include any written reprimand, demotion, suspension with or without pay, or dismissal from service. The [university] subscribes to the principles of progressive discipline. No disciplinary action shall be instituted against any bargaining unit

State *v.* Connecticut State University Organization of Administrative Faculty,
AFSCME, Council 4, Local 2836, AFL-CIO

The union contested the termination of the grievant's employment. On July 20 and 24, and August 17, 2020, pursuant to a grievance procedure provision in the parties' collective bargaining agreement, an arbitration hearing was held to determine the issues of (1) whether the dismissal of the grievant was for just cause, and (2) if not, what should be the remedy, consistent with the agreement.[3] The university presented the testimony of four witnesses at the hearing: Suski-Lenczewski, who testified about the investigation; the university's vice president for student affairs, who testified about the grievant's job duties; Officer Parker, who confirmed several aspects of the police incident report; and the grievant's wife, who corroborated the statements she made during her 911 call to the police and testified that she sought a protective order after the incident.

The union presented thirteen witnesses at the hearing, including the grievant, the university's chief administrative officer, a sergeant with the university's police department, other university employees, and former students. The union also presented the testimony of a licensed clinical social worker, who testified that the grievant had participated in and completed a therapeutic domestic violence offender program after his arrest

member without just cause. Any disciplinary action shall be predicated upon written charges related directly and substantially to the alleged unsuitability of the member to discharge his professional responsibilities. Discipline shall not be used to restrain members in the exercise of academic freedom or other rights of citizens.

\* \* \*

"20.4 If a disciplinary grievance proceeds through arbitration, the arbitrator may:

"(1) approve the disciplinary action imposed by the [u]niversity;

"(2) reduce or modify such penalty as appropriate under the circumstances; [or]

"(3) eliminate the penalty with a purging of the record and restoration of all pay and benefits."

[3] The union also alleged that the university had not provided specific written charges to the grievant, as required by the collective bargaining agreement. The arbitrator ultimately rejected this claim, which is not part of this appeal.

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

and had continued work beyond that 6 month course, completing a total of approximately 150 sessions.

The union presented undisputed evidence that the university had no history of disciplining any employee for an off-duty arrest and that no members of the bargaining unit had ever been disciplined for their off-duty conduct. Indeed, the union presented evidence that at least two university employees were arrested for public indecency, including a professor, the university's president was arrested for impersonating a police officer, and another employee was arrested for harassment, but none of those employees was disciplined, let alone terminated.

The arbitrator issued his decision on November 30, 2020, concluding that the university did not have just cause to terminate the employment of the grievant. In reaching his decision, the arbitrator acknowledged that "[t]his case centers on the credibility of the two main participants to this event, the grievant and his wife . . . . Each has an entirely different version of the events of that evening. In this case, the university has made a determination that [the wife's] version is the more credible, claiming that it has established the appropriate nexus between the grievant's job duties and the events on the evening of April 24, 2018."

The arbitrator then focused on the investigation conducted by the university, explaining that "[the wife] did not speak to the university's representative during the investigation regarding the events of the night of April 24, 2018, and did not appear at the *Loudermill* [hearing].[4] The university reached [its] conclusion [on the

---

[4] " '[A] tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story' before termination. *Board of Education* v. *Loudermill*, [470 U.S. 532, 546, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)]. The opportunity to present one's 'side of the story' is generally referred to as a *Loudermill* hearing." *AFSCME, Council 4, Local 2663* v. *Dept. of Children & Families*, 317 Conn. 238, 243 n.3, 117 A.3d 470 (2015).

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

basis of] the police incident report, which the university claims gave . . . Suski-Lenczewski 'more than a reasonable basis to credit as true' . . . [the wife's] sworn testimony at the hearing regarding her petition for a protective order, the notice of pending charges taken from the Judicial [Branch's] Internet website, and conversations . . . Suski-Lenczewski had with the university's police chief and a deputy police chief for the city of Hartford." (Citation omitted; footnote added; footnote omitted.)

The arbitrator reasoned: "Admittedly, the character of [the wife's] testimony is such that it is difficult to believe that she would fabricate such a story. And the grievant's contention that [his wife] made false allegations so that she could easily extricate herself from the marriage seems, at first blush, difficult to believe. A fact finder in any such case cannot determine what actually happened but only what probably happened. In trying to make that assessment, I find that there is compelling evidence that calls into question the narrative as reported by the incident report and [the wife's] testimony before the court in the protective order proceeding."

The arbitrator then went on to detail that the incident report contained only the statement of the wife and the impressions of Officer Parker, the arresting police officer. The criminal charges were dismissed upon the granting of the grievant's oral motion to dismiss, and the Department of Children and Families reversed its finding of neglect. The arbitrator also found that "there are significant parts of [the wife's] story that she related to the investigating officer that were not corroborated by, and [were] seemingly contradicted by, other evidence in the record."

For instance, the arbitrator found that the wife's claim that the grievant bound her wrists and taped her mouth

349 Conn. 148 JUNE, 2024 159

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

with duct tape was contradicted by the DNA tests on the two pieces of duct tape that were found at the scene, one of which contained only the wife's DNA, and the grievant's DNA was eliminated from that piece. The arbitrator also found that the wife's statement, made during both her 911 call and her testimony at the hearing on the protective order, that the grievant was " 'drunk' " was contradicted by the result of his breath test at the hospital, which had a reading of 0.0 percent blood alcohol content, and that there was nothing in the recording of the call between the grievant and the dispatcher that indicated that the grievant was inebriated. The arbitrator further found that the wife's statement, made during her testimony at the hearing on the protective order, that she vomited on the floor of the basement as a result of being gagged was not supported by other evidence. In support of this finding, the arbitrator noted that there was no mention of her vomiting in the police incident report, and, more specifically, Officer Parker made no mention in his report of discovering any vomit or vomit residue on the floor of the basement.

In contrast, the arbitrator found that the grievant's testimony was credible and corroborated by other evidence in the record, including records of his phone calls to the police on the night of the incident. In particular, the arbitrator also found that, "[a]s for [the grievant's] reluctance to leave the home, [the grievant] credibly testified that he felt [that] his life was in danger, and [he] was unwilling to exit until he felt confident about his safety. He was not contacted by [Officer Manson] to discuss his removal until 1:38 a.m." Moreover, the arbitrator found that "[t]he union presented a number of witnesses who testified on the grievant's behalf. . . . All of these witnesses testified that they [had] the highest regard for the grievant's integrity [and] professionalism, and those individuals employed by the uni-

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

versity commented on his dedication and commitment to the university.''

The arbitrator explained: ''[I]n situations [in which] an employee has been charged with a crime and arrested, but there has not been a court determination [as to whether the employee is guilty or not guilty], arbitrators generally have held that the fact that an employee has been arrested is not sufficient, standing alone, to justify discharge. . . . Put another way, in a situation [in which] an employee has been charged with criminal conduct that impacts his ability to perform his job duties, an employer may decide to discharge an employee immediately or may suspend him pending the outcome of the criminal case. If the employer decides to terminate an employee without waiting for the criminal charges to be resolved, it must produce convincing evidence that the charges made against the employee are valid. In this case, the investigation conducted by the university failed to prove by convincing evidence that the charges were substantial and well-founded.'' (Citation omitted.) The arbitrator also found that, ''[w]ith regard to the negative publicity, which generated four requests by former students to have the grievant's initial decision[s] [on their own student conduct cases] reviewed, the university found no basis for overturning those decisions. More importantly, negative publicity generated by unproven allegations does not typically establish the appropriate nexus between the grievant's job duties and his off-duty conduct.''

The arbitrator ultimately concluded that ''the [university's] investigation failed to [establish], by clear and convincing evidence, that the grievant was guilty as charged. For this reason, I return the grievant to his position [as] director of student conduct, remove the penalty from his personnel file and require the university to make the grievant whole.''

349 Conn. 148 JUNE, 2024 161

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

Thereafter, the state filed an application to vacate the arbitration award, and the union filed a motion to confirm that award. See General Statutes §§ 52-417 and 52-418. In its application to vacate, the state contended that the award violated public policy. Specifically, the state claimed, inter alia, that the grievant's reinstatement "violate[d] [the] public trust because his actions, for which he was terminated, have a direct nexus with his responsibilities as director of student conduct and will have a detrimental effect on his necessary working relationships with students and [law] enforcement, among others." The trial court granted the state's application to vacate the award and denied the union's motion to confirm the award. This appeal followed.[5]

I

STANDARD OF REVIEW AND PUBLIC POLICY ANALYSIS

We begin with the well established standard of review. "Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution. . . . Furthermore, in applying this general rule of deference to an arbitrator's award, [e]very reasonable presumption and intendment will be made in favor of the [arbitral] award and of the [arbitrator's] acts and proceedings. . . .

"We have recognized, however, that an arbitration award should be vacated when, inter alia, it violates clear public policy. . . . When a challenge to a consensual arbitration award raises a legitimate and colorable claim of violation of public policy, the question of whether the award violates public policy requires de

---

[5] The union appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

novo judicial review.'' (Citations omitted; internal quotation marks omitted.) *State* v. *Connecticut Employees Union Independent*, 322 Conn. 713, 721, 142 A.3d 1122 (2016).

''We emphasize, however, that our de novo review is limited to the question of whether the arbitrator's [award] is itself contrary to an established public policy. In a case involving an unrestricted submission, when we conduct de novo review in response to a claim of a public policy violation, we do not review either the arbitrator's construction of the agreement, to determine whether that construction is correct, or the arbitrator's factual findings, to determine whether those findings have sufficient evidentiary support.'' (Emphasis omitted.) Id., 721 n.8. In reviewing a claim that an award rendered in a consensual arbitration violates this state's public policy, we are bound by the arbitrator's factual findings. Id.

''The public policy exception applies only when the award is clearly illegal or clearly violative of a strong public policy. . . . A challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them. . . . When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is not concerned with the correctness of the arbitrator's decision but with the lawfulness of enforcing the award. . . .

''The party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated. . . . [G]iven the narrow scope of the public policy limitation on arbitral authority, the trial court's order vacating the arbitrator's award should be upheld only if the plaintiff demonstrates that the

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

. . . award clearly violate[d] an established public policy mandate. . . . As we repeatedly have emphasized, implicit in the stringent and narrow confines of this exception to the rule of deference to arbitrators' determinations, is the notion that the exception must not be interpreted so broadly as to swallow the rule.'' (Citations omitted; internal quotation marks omitted.) Id., 722.

In considering a claim that considerations of public policy make the arbitration award unenforceable, the United States Supreme Court has explained that ''we must assume that the [collective bargaining] agreement itself calls for [the grievant's] reinstatement. That is because both [the] employer and [the] union have granted to the arbitrator the authority to interpret the meaning of their contract's language, including such words as 'just cause.' . . . They have 'bargained for' the 'arbitrator's construction' of their agreement. . . . And courts will set aside the arbitrator's interpretation of what [the] agreement means only in rare instances.'' (Citations omitted.) *Eastern Associated Coal Corp.* v. *United Mine Workers of America, District 17*, 531 U.S. 57, 61–62, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000). ''[A]s long as [an honest] arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision.'' (Internal quotation marks omitted.) Id., 62.

As the United States Supreme Court has explained: ''[T]he question to be answered is not whether [the employee's behavior] itself violates public policy, but whether the agreement to reinstate him does so. To put the question more specifically, does a contractual agreement to reinstate [the employee] . . . run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

interests?" (Citation omitted.) Id., 62–63. We acknowledge that, "in principle . . . courts' authority to invoke the public policy exception is not limited solely to instances [in which] the arbitration award itself violates positive law. Nevertheless, the public policy exception is narrow . . . ."[6] Id., 63. We are also mindful that, particularly when the legislature has already spoken, "courts should approach with particular caution pleas to divine further public policy in that area." Id.

Consistent with the foregoing law, the sole issue before us is whether public policy is violated by the arbitration award reinstating the grievant to employment after a court had dismissed his criminal charges stemming from off-duty conduct and he had successfully completed a six month therapeutic domestic violence offender program. This court employs a two-pronged analysis to determine whether an arbitration award should be vacated for violating public policy. "First, the court determines whether an explicit, well-defined and dominant public policy can be identified. If so, the court then decides if the arbitrator's award violated the public policy." (Internal quotation marks omitted.) *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 723.

We assume, for the purposes of this appeal, that the arbitration award reinstating the grievant implicates the explicit, well-defined and dominant public policies of protecting victims of domestic violence, including authorizing protective orders; see General Statutes (Supp. 2018)

---

[6] We agree with the United States Court of Appeals for the Third Circuit that, although statutes, regulations, and administrative decisions are examples of positive law, "[i]t seems reasonable that the contours of positive law are broad enough to include not just specific rules or prohibitions but also the stated purposes behind these rules or prohibitions. [When] the 'positive law' is a stated purpose behind a statute or regulation, to thwart the purpose is to 'violate positive law.' " *Exxon Shipping Co.* v. *Exxon Seamen's Union*, 993 F.2d 357, 364 (3d Cir. 1993).

349 Conn. 148 JUNE, 2024 165

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

§ 46b-15;[7] protecting children; see, e.g., General Statutes (Supp. 2018) § 17a-101 (a); and preventing interference with or endangering the police. See, e.g., General Statutes (Rev. to 2017) § 53a-167a (a).[8]

We turn next to the question of whether, under the facts and circumstances of this case, the arbitration award reinstating the grievant violated these public policies. "In making this determination, we are mindful that the fact that an employee's misconduct implicates public policy does not require the arbitrator to defer to the employer's chosen form of discipline for such misconduct. As the United States Supreme Court has held, an arbitrator is authorized to disagree with the sanction imposed for employee misconduct. . . . [Thus, the] arbitrator has the authority to choose the appropriate form of discipline even when the employee misconduct implicates public policy. . . . The party seeking to vacate an award reinstating a terminated employee bears the burden of proving that nothing less than . . . termination of . . . employment will suffice given the public policy at issue." (Citations omitted; internal quotation marks omitted.) *New Haven* v. *AFSCME, Council 4, Local 3144*, 338 Conn. 154, 173–74, 257 A.3d 947 (2021); see also *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 739 (emphasizing that "public policy based, judicial second-guessing of arbitral awards reinstating employees is very uncommon and is reserved for extraordinary circumstances").

A

*Burr Road* Factors

The seminal case in this area is *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees*

_____

[7] Hereinafter, all references to § 46b-15 are to the version of that statute in the 2018 supplement of the statute.

[8] Hereinafter, all references to § 53a-167a are to the 2017 revision of the statute.

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

*Union, District 1199*, 316 Conn. 618, 114 A.3d 144 (2015) (*Burr Road*). In that case, we clarified the factors a reviewing court should consider when evaluating a claim that an arbitration award reinstating a terminated employee violates public policy. See *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 725–26. We explained in *Burr Road* that a reviewing court's analysis should focus on four principal factors: "(1) any guidance offered by the relevant statutes, regulations, and other embodiments of the public policy at issue; (2) whether the employment at issue implicates public safety or the public trust; (3) the relative egregiousness of the grievant's conduct; and (4) whether the grievant is incorrigible."[9] *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 634. We made clear in *Burr Road* that, to the extent that the arbitrator did not make findings on the factors, "we are not free to supplement the record with factual findings of our own. . . . Consequently, our discussion of the *Burr Road* factors, in places, necessarily will be limited." (Citation omitted.) *State* v. *Connecticut Employees Union Independent*, supra, 726 n.12.

1

Statutes, Regulations and Other Embodiments
of Public Policy

"The first [*Burr Road*] factor requires us to consider whether the relevant statutes, regulations, and other

[9] In *Burr Road*, we noted that consensus on whether an arbitral award violates public policy "has proved elusive." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 633. "[T]o assure consistent, principled decision making in cases of this nature," we "clarif[ied] the factors a reviewing court should consider when evaluating a claim that an arbitration award reinstating a terminated employee violates public policy . . . ." Id. Although *Burr Road* did not purport to overrule any of our existing case law holding that reinstatement of a terminated employee violated a clear public policy, the factors enumerated therein were intended to ensure that the public policy exception is construed "stringent[ly] and narrow[ly]," with "deference to arbitrators' determinations . . . ." (Internal quotation marks omitted.) Id., 631–32.

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

manifestations of the public policy at issue themselves recommend or require termination of employment as the sole acceptable remedy for a violation thereof. . . . Put differently, we ask whether the offense committed by the employee involves the sort of conduct the law deems to be inexpiable, or that would expose the employer to substantial liability if it were to reoccur. . . . Whether sources of public policy themselves mandate termination is a question of law subject to plenary review.'' (Citations omitted.) *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 634–35.

In the present case, the state does not point to, and we cannot find, any statute, regulation, or case law that mandates the termination of the grievant's employment. Indeed, although § 53a-167a (a) manifests a public policy against interfering with a police officer in the performance of his or her duties, it does not recommend or require termination of employment of an individual charged with a violation of it. Similarly, although § 46b-15 manifests a public policy of protecting victims of domestic violence and is a very important tool to accomplish that purpose, there is nothing in that statute that recommends or mandates the termination of employment of an individual who is subject to a protective order.

Without any statute or regulation requiring or recommending the termination of the grievant's employment, the state instead points to the university's code of conduct for employees. The code of conduct provided that ''[a]ll members of the [Connecticut State Colleges and Universities] community have a duty to conduct themselves with integrity, to act with the highest ethical and professional standards, to exercise responsible judgment, and to demonstrate accountability and compliance with state and federal law, [Board of Regents for Higher Education] policies and procedures, and collec-

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

tive bargaining agreements." The university's code of conduct did not, however, specify that termination was the sole remedy for a violation thereof.

In fact, the collective bargaining agreement between the parties explained that "the [university] subscribes to the principles of progressive discipline." The collective bargaining agreement further specified that "[d]iscipline of a member [of the union] may include any written reprimand, demotion, suspension with or without pay, or dismissal from service." Therefore, even if we were to agree that the grievant's behavior violated the university's code of conduct, that code of conduct did not require or recommend the termination of the grievant's employment. Instead, the collective bargaining agreement expressly provided for progressive discipline.

We have declined on multiple occasions to vacate an arbitration award on the ground that it violated public policy when the employer could not point to an explicit, well-defined public policy that mandated termination. See, e.g., *New Haven* v. *AFSCME, Council 4, Local 3144*, supra, 338 Conn. 157, 178–79 (declining to vacate arbitration award reinstating employee when "[t]he city has identified no provision of [the parties' collective bargaining] agreement or an employee regulation or ordinance that requires termination of employment for employees who disregard the advice of the corporation counsel's office"); *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 715–16, 726–28 (public policy did not mandate termination of employment of state employee who had been caught smoking marijuana at work because relevant state regulations and drug-free workplace policy provided that state employees may be disciplined short of termination of employment for use of illegal drugs while on duty); *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 271 Conn. 127, 130–31, 136–37, 139–40, 142, 855 A.2d 964 (2004) (public policy did not mandate

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

termination of employment of state employee who deliberately shoved disabled client into chair, causing him to sustain injury); see also, e.g., *Boston Medical Center* v. *Service Employees International Union, Local 285*, 260 F.3d 16, 25–27 (1st Cir. 2001) (holding that termination of employment of negligent nurse was not required by public policy when Massachusetts laws and regulations did "not establish a public policy prohibiting [the employee's] reinstatement" and there was "no specific provision of Massachusetts law that would [have been] violated by the arbitrator's order to reinstate [the employee]"), cert. denied, 534 U.S. 1083, 122 S. Ct. 816, 151 L. Ed. 2d 700 (2002); *Saint Mary Home, Inc.* v. *Service Employees International Union, District 1199*, 116 F.3d 41, 46 (2d Cir. 1997) ("[n]owhere does the [employer] point to an established policy that calls for a fixed disciplinary action of permanent dismissal in all cases [in which] drug related conduct occurs in the workplace").

A decision of the Alaska Supreme Court illustrates the reasoning underlying these cases. In *State* v. *Public Safety Employees Assn.*, 323 P.3d 670 (Alaska 2014), the court considered whether implementation of an award violated public policy when the source of the public policy did not compel termination. See id., 672. In that case, the award reinstated a state trooper whose employment was terminated for having consensual sex with a domestic violence victim the morning after assisting in the arrest of the victim's husband. See id. The court explained that "the relevant inquiry is not whether the [grievant's] conduct violated public policy but rather whether the arbitrator's award violates an explicit, well-defined, and dominant public policy. The public policies cited by the [s]tate [of Alaska] do not compel termination. And the [s]tate has not directed us to any public policy that would have compelled the termination of a trooper for the misconduct at issue at the time of the

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

arbitration. Indeed, the [s]tate clearly had the authority . . . to use progressive discipline rather than to discharge the [grievant]. No statute or internal regulation prohibited the use of progressive discipline in this case. Because the collective bargaining agreement provided for binding arbitration, the arbitrator also had the authority to impose progressive discipline. The arbitrator's order of reinstatement after suspension, therefore, cannot be characterized as a violation of public policy.'' (Footnotes omitted.) Id., 679.

We note that none of our case law should be understood to mean that the first *Burr Road* factor, standing alone, is dispositive of the public policy analysis. Numerous Connecticut cases demonstrate that an arbitration award involving employee discipline for conduct that occurred while on duty may be vacated under the public policy exception even when statutes, regulations, or other provisions of positive law do not mandate a specific outcome, such as termination of employment. See, e.g., *State* v. *AFSCME, Council 4, Local 391*, 309 Conn. 519, 521–22, 535, 538–39, 69 A.3d 927 (2013) (holding that public policy was violated when arbitrator ordered reinstatement of correction officer with lengthy history of workplace sexual harassment, despite absence of positive law mandating termination); *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 36, 46–48, 757 A.2d 501 (2000) (holding that public policy was violated when arbitrator ordered reinstatement of town employee who had embezzled town funds, despite absence of any positive law mandating termination); *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 468–69, 476–78, 747 A.2d 480 (2000) (holding that public policy was violated when arbitrator ordered reinstatement of correction officer who committed harassment in second degree by placing racist and profane call to state legislator, despite absence of positive law mandating termination).

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

We recognize in the present case the strong public policies against domestic violence and in support of cooperation with the police and child safety. But those strong public policies do not provide explicit support for the narrower public policy that the state seeks to invoke here: a policy against reinstatement of a long-term employee with no disciplinary history following off-duty conduct leading to an arrest and charges that have been dismissed.[10] The state does not point to an established policy that calls for a fixed disciplinary action of permanent dismissal in all cases in which an employee in the grievant's position is arrested for off-duty conduct. This court has long recognized that "the fact that there is a strong public policy against certain misconduct does not require an employer to terminate every employee who engages in that misconduct." *State* v. *AFSCME, Council 4, Local 391*, supra, 309 Conn. 534.

To repeat, whether the grievant's conduct violates a strong public policy is a different question from the one we must answer. The issue before us is whether the arbitrator's decision violates public policy, and the first *Burr Road* factor specifically requires us to determine,

---

[10] Given that the legislature has enacted the family violence education program; see General Statutes § 46b-38c (h) (1); which allows an individual charged with domestic violence to have his or her charges dismissed upon the completion of, inter alia, family violence education classes and a period of supervision with no further charges of domestic violence; see General Statutes § 46b-38c (h) (2); we are reluctant to conclude that the public policy of this state would bar the reinstatement of an employee who has completed a six month therapeutic domestic violence offender program after his arrest and whose charges were dismissed. To be sure, as reflected in § 46b-38c (h) (1) through (3), it is also the policy of this state to get alleged offenders the help they need and, if they are compliant, to dismiss and erase all of their family violence charges.

Even though the grievant was not charged with interfering with an officer for refusing to immediately comply with police instructions or for the approximately three hour standoff, that charge is of the type that would also be subject to dismissal in our state pursuant to a diversionary program. See General Statutes (Rev. to 2017) § 54-56e (a), (c) and (f); see also *State* v. *Kevalis*, 313 Conn. 590, 592, 99 A.3d 196 (2014) (accelerated rehabilitation program was applicable to charge of interfering with officer).

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

on the facts found by the arbitrator, only whether any explicit public policy *prohibits his reinstatement.* None has been identified here. Therefore, this factor plainly weighs in favor of the union.

2

Public Trust

The second *Burr Road* factor "is whether the nature of the employment at issue implicates public safety or the public trust." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 635. The second *Burr Road* factor "hinges on general questions of law and policy and is, therefore, subject to plenary judicial review." Id., 637.

The state asserts that the grievant occupies a position of public trust. The state also asserts that this factor necessitates the termination of his employment because the grievant's actions conflict with the university's mission, goals, policies, or regulations, and that there is a nexus between his actions on the night of the incident and the judgment that he must exercise in his role as the director of student conduct for the university. The state further asserts that the grievant's credibility with students and parents has been impaired by his actions.

Although we agree with the state that the grievant occupies a position of public trust, the mere fact that an employee holds a position that implicates public safety or the public trust does not, in and of itself, mandate that termination of employment is the only acceptable action when such an employee engages in conduct that is objectionable to the employer. See, e.g., *New Haven* v. *AFSCME, Council 4, Local 3144*, supra, 338 Conn. 157, 167, 180 (declining to vacate arbitration award reinstating city employee to her position as executive director of city's Commission on Equal Opportuni-

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

ties and awarding her back pay even though she held position that arguably implicated public trust). Indeed, the undisputed evidence before the arbitrator in the present case was that multiple employees of the university who occupied positions of public trust had been arrested for off-duty conduct. The university's president was arrested for impersonating a police officer. One professor was arrested for public indecency. Another professor was arrested for harassment. The evidence before the arbitrator revealed that the university did not discipline these employees for their arrests or any other members of the bargaining unit for off-duty conduct.

The university has failed to present any significant evidence demonstrating why the grievant's off-duty conduct so impaired the public trust that termination was required. For example, the university did not present any testimony from any students, faculty, staff, or members of the university community who would be unable or unwilling to work with the grievant or to cooperate with him in the execution of his duties. In the absence of any such evidence, we cannot conclude that the grievant's reinstatement to his position as director of student conduct will impair the public trust. Accordingly, we conclude that this factor is neutral.

3

Egregiousness

The third *Burr Road* factor is "the relative egregiousness of the grievant's offense. . . . This factor encompasses myriad considerations, including, but not limited to: (1) the severity of the harms imposed and risks created by the grievant's conduct; (2) whether that conduct strikes at the core or falls on the periphery of the relevant public policy; (3) the intent of the grievant with respect to the offending conduct and the public policy at issue; (4) whether reinstating the grievant would send an unacceptable message to the public or

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

to other employees regarding the conduct in question; (5) the potential impact of the grievant's conduct on customers/clients and other nonparties to the employment contract; (6) whether the misconduct occurred during the performance of official duties; and (7) whether the award reinstating the [grievant] is founded on the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalance the public policy at issue. . . .

"This factor presents a mixed question of law and fact. We take as our starting point the factual findings of the arbitrator, which are not subject to judicial review. . . . We defer as well to the arbitrator's ultimate determination whether termination was a just or appropriate punishment for the conduct at issue." (Citations omitted; internal quotation marks omitted.) *Burr Road Operating Co. II*, *LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 637–38.

"[F]or purposes of the public policy analysis, [however] our determination of whether the conduct in question was so egregious that any punishment short of termination would offend public policy is not restricted to those findings, [as] they may be [case-specific]. . . . Judicial review . . . necessarily transcends the interests of the parties to the contract . . . and extends to the protection of other stakeholders and the public at large, who may be adversely impacted by the decision to reinstate the employee, and therefore requires a broader scope. . . . Accordingly, we review de novo the question whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue." (Citations omitted; internal quotation marks omitted.) S*tate* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 734.

In considering whether the egregiousness of the grievant's behavior requires termination of his employment,

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

we are bound by the factual findings of the arbitrator, which are not subject to judicial review. The arbitrator made a number of factual findings relevant to our resolution of this issue that we cannot evade.

a

Domestic Violence Related Charges

The arbitrator found that "there [was] compelling evidence that calls into question the narrative as reported by the incident report and [the wife's] testimony before the court in the protective order proceeding." The arbitrator further found that "the criminal charges, which were by all accounts . . . very serious, including strangulation and kidnapping, were all dismissed. The grievant testified that he was offered a plea deal on reduced charges, which he rejected because he had done nothing wrong. The university suggested, by eliciting testimony from [the wife], that the charges were dropped at her request because she did not wish to have her children visit their father in jail. However, there is no evidence that the prosecutor decided to drop the charges based on [the wife's] request. Rather, the court's record of the case reveals that the presiding judge granted the [grievant's] oral motion to dismiss."

The grievant was not convicted of the offenses for which he was arrested, and the arbitrator in the present case did not credit the allegations of domestic abuse. We are bound by the arbitrator's factual findings.

b

Actions Related to the Protection of Children

The arbitrator found that "the children were asleep and undisturbed during the entire incident, and the grievant repeatedly told the police that he would not harm his children . . . ." The arbitrator also found that "the findings by the [Department of Children and Fami-

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

lies] investigators that [the grievant] had physically neglected his children have been reversed on appeal as unsubstantiated.'' In other words, the department found no reasonable basis to believe that any neglect of the children occurred.

c

Actions Related to the Interference with Police Officers

The arbitrator found that "[the grievant] called the Hartford Police Department within [ten] minutes after his conversation with Officer Parker. . . . He testified that he had ten phone conversations with the police [on the night in question] and presented a copy of his phone records to corroborate his testimony. . . . He stated that he repeatedly told the police that 'I will not harm any law enforcement; I will not harm my children.' He testified that he made these statements because, as a large, Black man, he needed to establish communication with the police in order for them to determine that he was not a threat. . . . He further testified that he was told by the police at 12:31 a.m. to 'sit tight,' 'someone is coming to talk to you.' . . . That individual, [Officer Manson], did not . . . contact . . . [the grievant] until 1:38 a.m. . . . [The grievant] testified that his reluctance to leave his home was because he was trying to preserve his life. He claimed he was 'scared to death.' '' (Citations omitted.)

Indeed, the arbitrator found that "the grievant repeatedly told the police that he would not harm . . . law enforcement. As for his reluctance to leave the home, [the grievant] credibly testified that he felt [that] his life was in danger and [that he] was unwilling to exit until he felt confident about his safety. He was not contacted by [Officer Manson] to discuss his removal until 1:38 a.m.''

Thus, the arbitrator found that the domestic violence charges were not proven, the Department of Children

349 Conn. 148 JUNE, 2024 177
State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

and Families found no reasonable basis to believe that the children were neglected insofar as the charges related to child neglect were all unsubstantiated, and the grievant's reluctance to immediately comply with police instructions was due to his reasonable fear for his safety. On the basis of these factual findings by the arbitrator, which are not subject to judicial review, we cannot conclude that the harms imposed and risks created by the grievant's conduct were so severe as to require the termination of his employment.

We also must consider the intent of the grievant with respect to the offending conduct and the public policy at issue. As we explained in *Burr Road*, consideration of "the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalance the public policy at issue" is appropriate. *Burr Road Operating Co. II*, *LLC* v. *New England Health Care Employees Union*, *District 1199*, supra, 316 Conn. 638; see also id., 646–47 (relying on arbitrator's findings of mitigating factors and other findings that could have been mitigating to support conclusion that grievant's conduct was not so egregious as to require termination).

We wish to be clear that we do not condone the grievant's response to the police presence outside of his home. Rather than promptly and peaceably submit, as required by law, he declined to exit his home for questioning or arrest by the police officers for a lengthy period of time. The police considered the situation to present risks sufficiently dangerous to require emergency evacuation of the surrounding area.

The question, however, is not whether the grievant engaged in misconduct, but whether, on the facts as found by the arbitrator, termination of the grievant's employment was required as a matter of public policy. Our review of the arbitrator's findings demonstrates that he clearly took into account circumstances that

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

mitigated the grievant's refusal to leave his home when the police arrived. The arbitrator credited the grievant's testimony about the recent killings of Black men and his resultant fear for his safety, and that, in light of those concerns, the grievant responded to the police presence by initiating contact with the police to show that he was not a threat, rather than immediately walking out of his home or letting the officers in. In light of the arbitrator's findings, we will not deem the grievant's conduct inexcusably egregious because such a characterization fails to fully appreciate a reality that this court previously has recognized—namely, that some citizens, particularly minorities, are fearful that contact with the police can be dangerous.

Indeed, this court has expressly stated that, "[a]mong some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence. . . . [T]he evidence supporting the reasonableness of these beliefs is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclusive or insufficient." (Internal quotation marks omitted.) *State* v. *Edmonds*, 323 Conn. 34, 74, 145 A.3d 861 (2016), quoting *Illinois* v. *Wardlow*, 528 U.S. 119, 132–34, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (Stevens, J., concurring in part and dissenting in part). Our review of the arbitrator's decision in this case demonstrates that the arbitrator considered the grievant's fears related to the police presence credible and concluded that those fears mitigated the grievant's failure to immediately comply with police instructions during the incident.

We also consider it significant that the grievant was not charged with, let alone convicted of, any crime

State *v.* Connecticut State University Organization of Administrative Faculty,
AFSCME, Council 4, Local 2836, AFL-CIO

related to his interaction with the police on the night of the incident. It is difficult for us to see how any reviewing court could conclude that the grievant's conduct was so egregious as to require the termination of his employment to vindicate the public policy against interfering with a police officer when the police officers on the scene that night—despite having charged the grievant with several crimes spanning from kidnapping to breach of the peace—did not charge him with that crime or any other crime relating to his interaction with the police.

Furthermore, not only did the grievant contact the police shortly after they arrived, but he was told at 12:31 a.m. that an officer would contact him to negotiate his surrender. That officer did not contact the grievant until more than one hour later. When he was finally able to speak with Officer Manson and was assured that he could leave his home safely, the grievant ultimately complied with the police officers' instructions, was taken into custody, and was not charged with any crimes related to his interactions with the police. Cf. *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 478 (upholding trial court's vacatur of arbitration award reinstating employee charged with violation of criminal statute on ground that "[the] award violated a clearly defined public policy because [it] reinstated a state employee whose conduct blatantly violated both a criminal statute and the employment regulations set forth by the [D]epartment of [C]orrection").[11] Therefore, assessing this situation in context on the basis of the facts found by the arbitrator, we

---

[11] Although we note that criminal charges are not necessarily a prerequisite to a conclusion that an employee's actions are so egregious as to require the termination of his employment, they are a relevant consideration. See, e.g., *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 647 (noting that "the conduct itself was not criminal in nature" and concluding that behavior was not egregious).

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

cannot conclude that the grievant's conduct, when viewed as a whole and in light of the mitigating factors found by the arbitrator, was so severe as to require the termination of his employment.

We now turn to whether reinstating the grievant would send an unacceptable message to the public or to other university employees regarding the conduct in question and the potential impact of the grievant's conduct on students and other nonparties to the employment contract. In this regard, the state asserts that reinstatement of the grievant to his position as the university's director of student conduct after this incident would send an unacceptable message to the other employees of the university and the students and that his conduct had undermined his credibility with law enforcement.

The arbitrator explicitly rejected the university's claim that the grievant's credibility with law enforcement had been seriously undermined as a result of his conduct. The only evidence that the university introduced to demonstrate that this incident had any impact on its students was that four former students had asked to have their initial disciplinary decisions by the grievant overturned. The arbitrator noted that, "[a]ccording to the grievant, he [had] handled thousands of student conduct cases over the years, totaling in the neighborhood of 15,000." The arbitrator found that "[t]he university reviewed these four cases and determined that the issues raised by the [former] students [were] unfounded. In addition, the university undertook a review of a number of other cases that the grievant had adjudicated but found nothing improper regarding his determinations." The university presented no evidence to support its claim that there would be a negative impact on other employees.

The union, for its part, presented evidence that university employees would not be negatively impacted by

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

the grievant's reinstatement. The arbitrator credited the testimony of the university's chief administrative officer and a sergeant with the university's police force that "the grievant's arrest would not impact his interaction with either law enforcement or the university community in any substantial way." Therefore, we conclude that the state failed to satisfy its burden of establishing that the potential impact on nonparties to the employment contract is so negative so as to require the termination of the grievant's employment.

We next consider whether the alleged misconduct occurred during the performance of the grievant's official duties. As we discussed previously in this opinion, it is undisputed that the conduct at issue did not occur during the performance of the grievant's official duties. Instead, the conduct occurred at the grievant's home and involved a highly personal issue.

A review of the cases in which this court or the Appellate Court has vacated an arbitration award on the ground that it violated public policy reveals that, in the vast majority of cases, those courts have found awards to violate public policy when the employee's behavior involved a violation of an established law or policy that occurred during the performance of the employee's duties.[12] See, e.g., *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 36–37 (upholding trial court's vacatur of arbitration award reinstating

[12] The dissent relies on *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, 59 Conn. App. 793, 758 A.2d 387, cert. denied, 255 Conn. 905, 762 A.2d 910 (2000), for the proposition that off-duty conduct can form the basis for vacating an award for a violation of public policy. See id., 802–803. That case is readily distinguishable from the present case because the employee's off-duty conduct resulted in a conviction; see id., 795, 800–801, 803; and because the Appellate Court in that case pointed to certain regulations that embodied Connecticut's clear policy attaching high priority to the safe transportation of children by requiring, among other things, an annual review of bus drivers' criminal convictions. See id., 803–804 n.5. No equivalent regulations exist in this case with respect to the grievant's job position.

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

employee who embezzled from former employer because award violated public policy); *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 469, 476–78 (concluding that arbitration award reinstating correction officer who made harassing, racist phone calls to state legislator while on duty violated public policy because correction officer's conduct violated criminal statute and employment regulations of Department of Correction); *South Windsor* v. *South Windsor Police Union, Local 1480, Council 15, AFSCME, AFL-CIO*, 41 Conn. App. 649, 654, 677 A.2d 464 (concluding that arbitration award reinstating police officer who deliberately revealed identity of confidential informant violated public policy), cert. denied, 239 Conn. 926, 683 A.2d 22 (1996); *State* v. *Council 4, AFSCME*, 27 Conn. App. 635, 641–42, 608 A.2d 718 (1992) (upholding trial court's vacatur of arbitration award reinstating employee who misappropriated state funds because award violated public policy).[13]

In sum, we conclude that the factual findings of the arbitrator do not compel us to conclude that the griev-

---

[13] Although we do not suggest that reinstatement of an employee for off-duty conduct could never amount to a violation of public policy, courts have often distinguished between "disfavored conduct, in the abstract," and "disfavored conduct [that] is integral to the performance of employment duties." (Emphasis omitted.) *Delta Air Lines, Inc.* v. *Air Line Pilots Assn., International*, 861 F.2d 665, 671 (11th Cir. 1988), cert. denied, 493 U.S. 871, 110 S. Ct. 201, 107 L. Ed. 2d 154 (1989). Courts have also distinguished between off-duty conduct and on-duty conduct when examining an arbitration award requiring reinstatement of an employee. See, e.g., *Wilmington* v. *American Federation of State, County & Municipal Employees, Council 81, Local 1102*, Docket No. Civ. A. 19561-NC, 2003 WL 1530503, *1, *5 (Del. Ch. March 21, 2003) (declining to vacate arbitration award as violation of public policy when award required reinstatement of city employee who, while off duty, used pepper spray and was alleged to have kicked person being apprehended by police); *Southwest Ohio Regional Transit Authority* v. *Amalgamated Transit Union, Local 627*, 131 Ohio App. 3d 751, 757–58, 764–65, 723 N.E.2d 645 (1998) (declining to vacate arbitration award as violation of public policy when award required reinstatement of transit authority worker who tested positive for marijuana during physical examination on off-duty day), appeal denied, 85 Ohio St. 3d 1480, 709 N.E.2d 851 (1999).

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

ant's off-duty conduct was so egregious that public policy requires the termination of his employment.

### 4

### Incorrigibility

"The fourth *Burr Road* factor is whether the grievant is so incorrigible as to require [the] termination [of his employment]. . . . Put differently, in light of the grievant's full employment history, is there a substantial risk that, should a court uphold the arbitration award of reinstatement, this particular employee will reengage in the offending conduct? . . . Here, relevant considerations include whether, on the one hand, the grievant has committed similar offenses in the past and has disregarded an employer's prior warnings or clear policy statements; or, on the other hand, whether the grievant: (1) has generally performed his work in a competent and professional manner; (2) has demonstrated a willingness to change and an amenability to discipline; (3) has exhibited remorse and attempted to make restitution for past offenses; and (4) is likely to benefit from additional training and guidance. . . . We also consider whether the penalty imposed by the arbitrator is severe enough to deter future infractions by the grievant or others. . . . Because these considerations are largely fact based and [case-specific], a reviewing court must defer to an arbitrator's assessment—whether express or implied—that a particular employee is unlikely to reoffend if reinstated. . . . [In the absence of] an express finding by the arbitrator, which would be unreviewable, a court will deem an employee incorrigible only when the likelihood of recidivism is plain from the face of the record." (Internal quotation marks omitted.) *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 736–37.

Here, the arbitrator did not make any finding indicating that the grievant was incorrigible; nor does anything

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

in the record suggest that the grievant will likely recidivate. Rather, the record reveals the opposite. The incident involving the police appears to have been an isolated and idiosyncratic event, and the arbitrator heard the undisputed testimony of a licensed clinical social worker, a certified employee assistance professional, that the grievant had successfully completed a therapeutic domestic violence offender program after his arrest and had attended approximately 150 sessions. Accordingly, we cannot conclude that the grievant was so incorrigible as to require the termination of his employment.

As we emphasized in *Connecticut Employees Union Independent*, "public policy based, judicial second-guessing of arbitral awards reinstating employees is very uncommon and is reserved for extraordinary circumstances . . . . Our general deference to an experienced arbitrator's determinations regarding just cause and the appropriate remedy is vital to preserve the effectiveness of an important and efficient forum for the resolution of employment disputes. If an employer wishes to preserve the right to discharge employees guilty of misconduct . . . thereby removing the matter from an arbitrator's purview, it remains free to negotiate for the inclusion of an appropriate provision in the collective bargaining agreement that would achieve that result." Id., 739–40. We conclude that the state failed to demonstrate that an application of the *Burr Road* factors establishes that reinstatement of the grievant violates public policy.[14]

---

[14] We recognize that, although a nonexclusive list of multiple factors, such as the *Burr Road* factors, is useful to ensure consistent and principled decision-making; see footnote 9 of this opinion; "a [too] heavy focus on enumerated factors, or comparisons to other precedents, may eclipse the ultimate inquiry before the court, which is [case-specific] . . . ." (Internal quotation marks omitted.) *State* v. *Castillo*, 329 Conn. 311, 341, 186 A.3d 672 (2018) (*D'Auria, J.*, dissenting). Our focus on the *Burr Road* factors has not eclipsed the ultimate inquiry but, instead, has focused our attention on the question before us—whether the arbitration award reinstating the grievant's employment violates the public policy of this state.

349 Conn. 148        JUNE, 2024        185

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

II

THE DISSENT

A

Standard

The dissent's entire position rests on its disagreement with the remedy chosen by the arbitrator. The dissent asserts that "[the] reinstatement of the grievant without so much as a letter of reprimand or warning in his personnel file" violates public policy. The principal problem with that position is that it is premised on the fact that the grievant engaged in misconduct on the night in question consistent with the version of events told by his wife. However, the arbitrator did not find the testimony of the wife to be entirely credible, concluding that it was contradicted by compelling evidence. Essentially, the arbitrator evaluated all of the circumstances and determined, after hearing evidence from both parties, that the domestic dispute revolved around a credibility contest wherein, on balance, he believed the grievant's version of events. And, with respect to the approximately "three hour armed standoff," the arbitrator concluded that there were circumstances that mitigated the grievant's conduct. There is no claim here that the arbitrator acted outside of the scope of his authority in making his decision. Consequently, as the United States Supreme Court has stated, "the fact that a court is convinced [the arbitrator] committed serious error does not suffice to overturn his decision." (Internal quotation marks omitted.) *Eastern Associated Coal Corp.* v. *United Mine Workers of America, District 17*, supra, 531 U.S. 62. The United States Court of Appeals for the Eleventh Circuit has put the point more bluntly: "An arbitrator's [decision] may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish. Yet, it may not be subject to court interference." *Delta Air Lines, Inc.* v. *Air Line Pilots Assn.*,

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

*International*, 861 F.2d 665, 670 (11th Cir. 1988), cert. denied, 493 U.S. 871, 110 S. Ct. 201, 107 L. Ed. 2d 154 (1989). Thus, even if we were to conclude that the arbitrator's determination on the basis of the evidence is incorrect, or even unreasonable, that is simply not a basis to overturn his award.

The dissent also asserts that "the arbitration award in the present case is unprecedented in this state and in virtually every other jurisdiction by virtue of its failure to impose any sanction for conduct demonstrably at odds with the public policies at issue, the employee's job duties, and the employer's mission, regulations, and goals." We do not disagree that the arbitration award reinstating the grievant with full restoration of benefits reflects a permissive attitude toward the grievant's misconduct. But, again, our role is not to adjust the award to a disciplinary midpoint that conforms to our own standards of appropriate severity. We also observe, in this regard, that the state has taken an all-or-nothing approach on appeal, as the university did when seeking to terminate the grievant's employment and at the arbitration hearing, arguing that termination of the grievant's employment is mandated by the public policy of this state and that no lesser sanction will suffice. On this record, and in light of the way this case has been briefed and argued by the parties, we perceive no error.

Certainly, regardless of whether the arbitration award included some form of discipline, our review remains the same: we must determine whether the award violates an explicit, well-defined public policy. The United States Court of Appeals for the First Circuit has explained this point perfectly: "In the context of an arbitration award that reinstates a fired employee, the question is not whether the charged conduct offends public policy or whether some remedy short of unconditional reinstatement (say, a probationary period or a suspension without pay) might have been preferable. Rather, the

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

sole question is whether the award itself—the order for reinstatement—gives offense.'' *Mercy Hospital, Inc.* v. *Massachusetts Nurses Assn.*, 429 F.3d 338, 343 (1st Cir. 2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1939, 164 L. Ed. 2d 663 (2006).

The dissent also asserts that ''[i]t is well established that, when an arbitration award reinstating an employee is challenged as violative of public policy, the court must determine 'whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue.' *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, [supra, 316 Conn. 639] . . . .'' (Citation omitted; footnote omitted.) Although we acknowledge that this court included that language in *Burr Road*, we disagree that it was meant to expand the scope of the public policy exception or to establish a different standard.

Indeed, in *Burr Road* itself, we also reiterated the preexisting standard that ''a party seeking to vacate an arbitration award reinstating a terminated employee [on the ground that termination of employment is required as a matter of public policy] bears the burden of proving that illegality or conflict with public policy is clearly demonstrated . . . and that nothing less than the termination of [the grievant's] employment will suffice to vindicate the public policy at issue.'' (Citation omitted; internal quotation marks omitted.) Id., 631. Then, more recently, we reaffirmed that the appropriate question in such circumstances is whether ''nothing less than the termination of [the grievant's] employment will suffice given the public policy at issue.'' (Internal quotation marks omitted.) *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 725; see also *New Haven* v. *AFSCME, Council 4, Local 3144*, supra, 338 Conn. 174 (''[t]he party seeking to vacate an award reinstating a terminated employee bears the burden of proving that nothing less than . . . termination of . . . employ-

State *v.* Connecticut State University Organization of Administrative Faculty,
AFSCME, Council 4, Local 2836, AFL-CIO

ment will suffice given the public policy at issue'' (internal quotation marks omitted)).

Accordingly, it is clear that the standard remains that a party seeking to vacate an arbitration award reinstating a terminated employee must demonstrate that implementation of the award (here, reinstatement with full restoration of benefits) would violate a specific and well-defined public policy. Although this is a stringent standard, there are examples of when public policy requires vacatur of an award. See, e.g., *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 36–37; *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 469, 476–78. On the basis of the facts found by the arbitrator, we cannot agree with the dissent that the arbitration award requiring the grievant's reinstatement violates public policy.

B

De Novo Standard of Review

The dissent misapplies the de novo review afforded a claim that implementation of an arbitration award violates public policy. Contrary to the dissent's position, since *Burr Road*, this court has clarified that ''our de novo review is limited to the question of whether the arbitrator's decision [regarding the discipline or reinstatement of the grievant] is itself contrary to an established public policy. In a case involving an unrestricted submission, when we conduct de novo review in response to a claim of a public policy violation, we do not review either the arbitrator's construction of the agreement, to determine whether that construction is correct, or the arbitrator's factual findings, to determine whether those findings have sufficient evidentiary support.'' (Emphasis omitted.) *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 721 n.8. Moreover, this court has also explained that, in conducting the de novo review, we are *not* permitted to make fac-

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

tual findings of our own on the *Burr Road* factors. See id., 726 n.12 (explaining that, "to the extent the arbitrator failed to make factual findings pertinent to the analysis in [*Burr Road*], we are not free to supplement the record with factual findings of our own"). Contrary to this well established law, the dissent maintains that it can engage in fact-finding and speculation regarding factors such as how other stakeholders may be impacted by the grievant's reinstatement. We disagree.

The law makes clear that, although we can review the facts found by the arbitrator and use those facts to make a de novo determination about the egregiousness factors, we cannot make factual findings, assess the credibility of witnesses, or engage in speculation when applying these factors. See, e.g., *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 44–45, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987) ("[T]he [reviewing court] . . . properly considered the established fact that traces of marijuana had been found in [an employee's] car. . . . [Nevertheless, to] conclude from the fact that marijuana had been found in [the employee's] car that [the employee] had ever been or would be under the influence of marijuana while he was on the job and operating dangerous machinery is an exercise in [fact-finding] about [the employee's] use of drugs and his amenability to discipline, a task that exceeds the authority of a court asked to overturn an arbitration award." (Citation omitted.)).

Notwithstanding this established law, the dissent makes factual findings that the arbitrator never made and draws inferences that run directly counter to the findings made by the arbitrator. Specifically, the dissent asserts that "[t]he severity of the risks created by the grievant's armed standoff with the police, which required the police to evacuate the grievant's street in the middle of the night, are equally self-evident, as is the message that his unconditional reinstatement sends to the com-

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

munity. As the trial court stated, the message it sends is 'that it is appropriate for a university administrator charged with the public trust of investigating and enforcing the code of student conduct to take the law into his own hands . . . to refuse to unload weapons, and [to] maintain a lengthy standoff with [the] police. The recipients of such a message would include students, parents, other staff, and the public.' '' The dissent also asserts that ''[t]he arbitrator further found that the grievant refused to open his door, refused to unload his weapons, and repeatedly warned the police 'not [to] breach this house,' '' and, ''[g]iven these findings, as well as the grievant's statement that he was not ready to surrender, there can be no question but that the grievant intended to interfere with the police and to resist arrest.''[15]

The dissent asserts that these points compel the necessary inference that reinstatement of the grievant would send an unacceptable message to the public and/or other stakeholders. As the United States Supreme Court has recognized, ''it [is] inappropriate for [a reviewing court] itself to draw the necessary inference. . . . The parties did not bargain for the facts to be found by a

---

[15] The arbitrator did not find facts establishing that the grievant intended to interfere with the police or to resist arrest. The arbitrator explained that ''[the grievant] testified that his reluctance to leave his home was because he was trying to preserve his life. He claimed he was 'scared to death' . . . and that Officer Parker's representation in his incident report that there was a loaded gun on the kitchen table was a 'lie.' He asserted that he had disassembled the firearm on the kitchen table and that [Officer] Manson knows that to be true. . . . This fact, among others, would have been revealed if the police had released the rest of the phone conversations that evening, as his attorney requested.'' (Citations omitted.) Although we agree that the grievant should have promptly and peaceably exited his home for questioning or arrest in a manner that would have allowed the police to determine that he was not a threat (and thus ensured his own safety), the specific question of the grievant's criminal intent was left unresolved by the arbitrator, and the factual record is sufficiently ambiguous to prevent us from reaching any definitive conclusion in that regard.

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

court, but by an arbitrator chosen by them who had more opportunity to observe [the grievant] and to be familiar with the [employer] and its problems. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task. If additional facts were to be found, the arbitrator should find them . . . .'' *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, supra, 484 U.S. 44–45.

In addition to the fact that the dissent relies on facts not found by the arbitrator, it also does not consider the conflicting evidence. Although Suski-Lenczewski testified that four former students asked to have their own student conduct cases reviewed and that one parent did not want the grievant to have any further communication or interaction with the parent's daughter, the university did not present any witnesses to testify about the impact that the grievant's behavior had on them. On the other hand, the union presented the testimony of two former students and multiple university employees, who all testified after the incident in question about their favorable interactions with, and impressions of, the grievant. At best, there was conflicting testimony on this point.

The arbitrator considered this conflicting evidence, and, relying in part on the fact that the university found no basis for overturning any of the grievant's decisions and the fact that "negative publicity generated by unproven allegations does not typically establish the appropriate nexus between [a] grievant's job duties and his off-duty conduct," the arbitrator rejected the university's claim that this factor supported the university's decision to terminate the grievant's employment. Because the arbitrator made a factual finding that the negative publicity caused by the unproven allegations would not have a chilling effect on this issue, we are not free to

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

make our own finding or to choose which testimony we find more credible.

Instead of relying on the factual findings of the arbitrator, as we must, the dissent makes numerous factual inferences and relies on speculation to reach its conclusion. For instance, the dissent asserts that "[t]he message that the . . . [arbitration] award sends to other employees occupying similar positions of trust, not to mention the nonparty stakeholders in this case—students, their parents, and the public at large—is simply untenable." The dissent, however, is not able to point to any testimony or other evidence presented at the arbitration hearing or to factual findings of the arbitrator to support its conclusion that reinstatement of the grievant would have any negative effect on the students, parents, or other nonparty stakeholders in this case. Moreover, the dissent's position is contrary to findings that the arbitrator actually made, including his finding that the grievant's arrest "would not impact his interaction with either law enforcement or the university community in any substantial way." The university certainly could have presented such evidence at the arbitration, but it did not, and we cannot fill that evidentiary void for it.

C

Protective Order Hearing

The dissent asserts that "[a] trial court . . . found that [the grievant] posed a continuous threat of violence to [his wife] and, pursuant to . . . § 46b-15, issued a one year, full domestic violence order of protection against him." (Footnote omitted.) The dissent further relies on the transcript of that protective order hearing that was entered into evidence at the arbitration hearing. See footnote 10 of the dissenting opinion. We disagree with the dissent's reliance on the transcript of

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

that protective order, rather than the facts as found by the arbitrator.

It is important to remember that the protective order was issued approximately two weeks after the incident, at a time when the grievant's criminal charges were still pending, and without any testimony from the grievant during the hearing. This timing reflects the expeditious treatment of protective orders under § 46b-15, which serves an incredibly important purpose in promoting the state's public policy of protecting victims of domestic violence. However, the issuance of a protective order does not decide all further issues between the parties and certainly does not determine the appropriate employment related discipline under the collective bargaining agreement governing the present case. Indeed, if it were otherwise, courts may hesitate to issue a protective order in such an expedited fashion, a result we are loathe to encourage.

In the present case, the trial court that issued the protective order under § 46b-15 was not only doing so in an expedited manner but, unlike the arbitrator, did not hear any testimony from the grievant or have access to any of the other independent evidence presented by both parties at the arbitration hearing. The court was therefore in no position to make a credibility determination as to which story was more credible. The dissent has not cited to any legal principle that prohibited the arbitrator from making his own credibility determination after hearing all the evidence before him, some of which called into question the veracity of certain parts of the wife's rendition of the events. The arbitrator also was required to apply a higher standard of proof than that applied under § 46b-15. In short, the arbitrator was not bound by the findings of the trial court that issued the protective order, and the fact that the arbitrator's determinations varied from those of that court does not

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

demonstrate that the arbitration award violates public policy.

We are acutely aware of the real and all too common risks of domestic violence and the importance of allowing courts to issue protective orders in an expedited fashion in an effort to provide relief for abuse victims. Bearing this in mind, however, we cannot conclude that the state has met its burden of demonstrating that reinstatement of the grievant is necessarily incompatible with the public policy of protecting victims of domestic violence.

Moreover, at the time that the arbitrator issued his decision reinstating the grievant to his position, not only was the grievant no longer the subject of a domestic violence protective order, but he had completed a 6 month therapeutic domestic violence offender program and had continued work beyond that course, completing a total of approximately 150 sessions. The dissent attempts to dismiss this fact by asserting that "[t]he program . . . was not a condition of the grievant's reinstatement or otherwise part of the arbitral award. The director of that program, Charles Frazier, who testified on behalf of the grievant at the arbitration hearing, stated that he was unsure whether the grievant's participation in the program was court-ordered or whether it was undertaken on the advice of counsel given the seriousness of the charges the grievant was facing at the time of his arrest." Footnote 19 of the dissenting opinion. Regardless of the reason why the grievant attended the program, the undisputed evidence was that the grievant completed 150 sessions of domestic violence offender training. We see no reason why the fact that he was not required to attend the program as a condition of reinstatement is relevant to whether he is incorrigible. Indeed, the grievant's willingness to attend the program without a court order or a requirement

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

by his employer supports the conclusion that he was not incorrigible.

### III

### CONCLUSION

The state and the dissent seem to assert that the reinstatement of the grievant to his position violates public policy insofar as the university has determined that he can no longer serve in his role as its director of student conduct because students will not trust him. We recognize that reasonable people may differ as to whether reinstatement or discharge is the more appropriate remedy here. But both the university and the union have agreed to entrust this decision to an arbitrator. The state has not proven that there is law or legal precedent reflecting an "explicit, well-defined, and dominant public policy" to which the arbitrator's decision "run[s] contrary . . . ." *Eastern Associated Coal Corp.* v. *United Mine Workers of America, District 17*, supra, 531 U.S. 63. In light of the foregoing, we conclude that the state has failed to meet its burden of demonstrating that enforcement of the arbitration award, reinstating the grievant's employment, violates public policy.

The judgment is reversed and the case is remanded with direction to grant the union's motion to confirm the arbitration award reinstating the grievant's employment and to deny the state's application to vacate that arbitration award.

In this opinion McDONALD, D'AURIA and ECKER, Js., concurred.

ALEXANDER, J., with whom ROBINSON, C. J., joins, dissenting. It is well established that, when an arbitration award reinstating an employee is challenged as

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

violative of public policy,[1] the court must determine "whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, 316 Conn. 618, 639, 114 A.3d 144 (2015) (*Burr Road*); see id., 640 ("[w]e [must] consider whether the penalty imposed by the arbitrator is severe enough to deter future infractions by the grievant or others"). If it is, the award must stand. I disagree with the majority that the award in the present case—reinstatement of the grievant without so much as a letter of reprimand or warning in his personnel file—satisfies this standard.

I am aware of only one Connecticut case involving a colorable public policy challenge to an arbitral award in which the arbitrator imposed no sanction whatsoever. In that case, this court affirmed the trial court's judgment vacating the award as against public policy. See *Groton* v. *United Steelworkers of America*, 254 Conn. 35, 36–37, 52, 757 A.2d 501 (2000).[2] The case

---

[1] The majority assumes, for purposes of this appeal, that "the arbitration award reinstating the grievant implicates the explicit, well-defined and dominant public policies of protecting victims of domestic violence, including authorizing protective orders; see General Statutes (Supp. 2018) § 46b-15; protecting children; see, e.g., General Statutes (Supp. 2018) § 17a-101 (a); and preventing interference with or endangering the police. See, e.g., General Statutes (Rev. to 2017) § 53a-167a (a)." (Footnote omitted.) I agree that these policies are implicated in this case, in addition to the public policy against armed resistance to arrest and breach of the peace.

[2] Discipline was imposed in all such cases cited in the majority opinion except *Groton*. See *New Haven* v. *AFSCME, Council 4, Local 3144*, 338 Conn. 154, 167, 182 and n.19, 257 A.3d 947 (2021) (loss of two years of pay and benefits); *State* v. *Connecticut Employees Union Independent*, 322 Conn. 713, 720, 142 A.3d 1122 (2016) (six month suspension without pay); *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 627 (one month suspension without pay and final warning); *State* v. *AFSCME, Council 4, Local 391*, 309 Conn. 519, 523, 69 A.3d 927 (2013) (one year suspension without pay and benefits), *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 271 Conn. 127, 132, 855 A.2d 964 (2004) (thirty day suspension without pay and benefits), *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 471, 747 A.2d 480 (2000) (sixty day suspension without pay);

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

law reveals that, in most cases involving public policy challenges to arbitral awards, it is precisely *because* discipline was imposed that courts are able to conclude that an award does *not* violate public policy. See, e.g., *Eastern Associated Coal Corp.* v. *United Mine Workers of America, District 17*, 531 U.S. 57, 65–66, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000) ("The award before us is not contrary to [public policy because it] . . . does not condone [the grievant's] conduct or ignore the risk to public safety that drug use by truck drivers may pose. Rather, the award punishes [the grievant] by suspending him for three months, thereby depriving him of nearly [$9000] in lost wages . . . it requires him to pay the arbitration costs of both sides; it insists [on] further [substance abuse] treatment and testing; and it makes clear (by requiring [the grievant] to provide a signed letter of resignation) that one more failed test means discharge." (Citation omitted.)); *Way Bakery* v. *Truck Drivers Local No. 164*, 363 F.3d 590, 596 (6th Cir. 2004) ("[T]he arbitration award . . . did not condone [the employee's off-duty, racially offensive remark to a coworker], but rather punished him by depriving him of his salary for six months and placing him on probation for five years. . . . We therefore hold that the arbitrator's award . . . did not violate public policy."); *New Haven* v. *AFSCME, Council 4, Local 3144*, 338 Conn. 154, 182, 257 A.3d 947 (2021) ("an award reinstating [the employee] but . . . essentially docking her two years of pay . . . [was sufficient to] vindicate the public policies at issue and [to] send a powerful message to other municipal employees and the public at large that similar conduct will not be tolerated" (footnote omitted)); *State* v. *Connecticut Employees Union Independent*, 322 Conn. 713, 738, 142 A.3d 1122 (2016)

---

*South Windsor* v. *South Windsor Police Union, Local 1480, Council 15, AFSCME, AFL-CIO*, 41 Conn. App. 649, 651, 677 A.2d 464 (150 day suspension without pay), cert. denied, 239 Conn. 926, 683 A.2d 22 (1996).

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

("[T]he discipline the arbitrator imposed was appropriately severe, and sends a message to others who might consider committing similar misconduct that painful consequences will result. The award provides a disincentive for the grievant to reoffend, and it makes clear that, should he be foolish enough to do so, he will be seeking new employment."); *Stratford* v. *AFSCME, Council 15, Local 407*, 315 Conn. 49, 61 n.6, 105 A.3d 148 (2014) (concluding that "the sanction of nine months without pay and future medical examinations is a sufficiently severe penalty that [reinstatement] does not violate public policy"); *Aurora* v. *Assn. of Professional Police Officers*, 124 N.E.3d 558, 575 (Ill. App.) (upholding award reinstating employee because "remedy [was] severe enough that [the employee] and the community knew that [the employee's] behavior was not acceptable"), appeal denied, 124 N.E.3d 505 (Ill. 2019); *De Witt* v. *AFSCME, Council 31*, 298 Ill. App. 3d 634, 639, 699 N.E.2d 163 (The arbitrator's award reinstating the employee "without the slightest reprimand for her behavior" violated public policy because the arbitrator "did not take any precautionary steps to deter future misconduct or to ensure it will not be repeated. . . . If anything, the arbitrator's award encourages [future] misconduct . . . [by] employees . . . ." (Citation omitted.)), appeal denied, 181 Ill. 2d 569, 706 N.E.2d 496 (1998); *Philadelphia Housing Authority* v. *AFSCME, District Council 33, Local 934*, 617 Pa. 69, 79, 52 A.3d 1117 (2012) ("the arbitrator's award forcing [the employer] to take [the employee] back with full back pay—without any sanction at all—violates a well-defined and dominant public policy against sexual harassment in the workplace"); cf. *International Union of Operating Engineers, AFL-CIO, Local 286* v. *Port of Seattle*, 176 Wn. 2d 712, 723, 295 P.3d 736 (2013) ("when an arbitrator's punishment is so lenient that it will not deter future discrimination—including discrimination committed by others—it must be vacated").

349 Conn. 148      JUNE, 2024      199

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

Indeed, the arbitration award in the present case is unprecedented in this state and in virtually every other jurisdiction by virtue of its failure to impose any sanction for conduct demonstrably at odds with the public policies at issue, the employee's job duties, and the employer's mission, regulations, and goals.[3]

---

[3] The majority responds to this point, and the ample case law supporting it, by arguing that the courts' focus in these other cases—i.e., on whether the award was sufficient to vindicate the public policy at issue—were mere dicta rather than being essential to the courts' holdings. Specifically, the majority asserts that, "[a]lthough . . . this court included . . . language in *Burr Road* [that an award must be sufficient to vindicate the public policy at issue], we disagree that it was meant to expand the scope of the public policy exception . . . ." The majority contends that "the appropriate question in [cases such as the present one] is whether nothing less than the termination of [the grievant's] employment will suffice given the public policy at issue." (Internal quotation marks omitted.) Contrary to the majority's assertion, the case law demonstrates that consideration of whether an award is sufficient to vindicate public policy is not an expansion of the public policy exception but, rather, is an essential component of it. This is why, in *Eastern Associated Coal Corp.* v. *United Mine Workers of America, District 17*, supra, 531 U.S. 65–66, the United States Supreme Court took pains to note that the award fashioned by the arbitrator in that case "was carefully crafted to address, not ignore, the public policy concerns inherent in the reinstatement of a . . . truck driver who had twice violated [federal] restrictions on marijuana use by persons in 'safety-sensitive' jobs. Reinstatement was conditioned [on] acceptance of a [three month] suspension without pay, signing of a 'last chance' agreement (an undated letter of resignation), provisions for drug treatment, random drug testing at the employer's discretion, and reimbursement of the employer's costs in arbitration. The . . . [c]ourt expressly relied on these conditions in . . . [holding that the award was not violative of public policy]." (Footnote omitted.) H. Drummonds, "The Public Policy Exception to Arbitration Award Enforcement: A Path Through the Bramble Bush," 49 Willamette L. Rev. 105, 127 (2012).

In contrast, I have traced the "nothing less than termination" language that the majority argues is the "appropriate" standard to a 2007 Appellate Court case, *Brantley* v. *New Haven*, 100 Conn. App. 853, 920 A.2d 331 (2007), in which the court stated, at the conclusion of its analysis, that it could not conclude that the plaintiff employee's conduct was "so egregious that it requires nothing less than termination of [his] employment so as not to violate public policy." Id., 863. The Appellate Court, however, did not treat the quoted language as the standard by which the public policy claim was to be measured. In *Brantley*, the arbitrator had imposed an eight month, unpaid suspension in lieu of termination after it was determined that the plaintiff, a New Haven firefighter, had violated the city's computer hardware

State *v.* Connecticut State University Organization of Administrative Faculty,
AFSCME, Council 4, Local 2836, AFL-CIO

The critical facts are not in dispute. Following a confrontation with his wife, C,[4] the grievant engaged in a two and one-half hour armed standoff with the police. The trial court subsequently found that he posed a continuous threat of violence to C and, pursuant to General Statutes (Supp. 2018) § 46b-15,[5] issued a one year, full

---

and software policy. Id., 855–56, 858. A careful reading of *Brantley* makes clear that the Appellate Court's statement that it could not conclude that the plaintiff's conduct was so egregious that it required nothing less than termination was simply meant to convey that termination of the plaintiff's employment was not the only means of vindicating the public policy at issue in that case. The "nothing less than termination" language appeared for the first time in a decision of this court in 2013. See *State* v. *AFSCME, Council 4, Local 391*, 309 Conn. 519, 531, 69 A.3d 927 (2013) (quoting *Brantley*). Notably, I have not found a federal or state court case that has ever cast the issue in similar terms, that is, as requiring a determination of whether nothing less than termination of employment will suffice to vindicate the public policy at issue. To be sure, casting the issue in these terms is logical when discipline has been imposed by the arbitrator because, if a six or eight month, unpaid suspension cannot vindicate the public policy at issue, then, logically, nothing short of termination will. The present case, however, presents a highly unique circumstance—one that readily distinguishes it from cases that have come before it—because the arbitrator imposed no discipline at all for conduct palpably at odds with the employee's job duties and the employer's mission.

[4] In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

[5] General Statutes (Supp. 2018) § 46b-15 (a) provides in relevant part: "Any family or household member . . . who has been subjected to a continuous threat of present physical pain or physical injury, stalking or a pattern of threatening, including, but not limited to, a pattern of threatening . . . by another family or household member may make an application to the Superior Court for relief under this section. . . ."

"Section 46b-15 is part of title 46b [of the General Statutes], 'Family Law,' and chapter 815a, 'Family Matters,' and, as such, is specifically included as a court proceeding in a family relations matter. See General Statutes § 46b-1 (5)." *Princess Q. H.* v. *Robert H.*, 150 Conn. App. 105, 111 n.3, 89 A.3d 896 (2014). "The plain language of § 46b-15 clearly requires a continuous threat of present physical pain or physical injury before a court can [issue] a domestic violence restraining order." *Krystyna W.* v. *Janusz W.*, 127 Conn. App. 586, 590, 14 A.3d 483 (2011).

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

domestic violence order of protection against him. As a result of these events, which were widely publicized in the media, the grievant was terminated from his position as the director of student conduct at Central Connecticut State University (university). In that capacity, the grievant had been tasked with investigating and prosecuting violations of the student code of conduct, including intimate partner violence, stalking, and dating violence. The grievant was also a member of the university's threat assessment, behavioral risk, and sexual assault response teams, and the self-described "deputy Title IX officer" for the university.[6] Given his behavior on the night in question, his utter lack of remorse afterward, and the highly sensitive nature of his work, the university determined that the grievant could no longer discharge the duties of his office.

For the reasons set forth hereinafter, and after due consideration of the four factors articulated by this court in *Burr Road*,[7] I conclude that, when an employee tasked with investigating and prosecuting violations of the student code of conduct is himself accused of criminal misconduct, and his response is to refuse to open his door to the police for almost three hours, to refuse to unload his firearms, and to repeatedly warn the police not to breach his house, it is against the explicit, well-defined, and dominant public policies against armed resistance to arrest, of preserving the peace, and of noninterference with the police to unconditionally reinstate him to his former position. Under General Statutes

---

[6] Title IX was enacted as part of the Education Amendments of 1972, Pub. L. No. 92-318, §§ 901–907, 86 Stat. 235, 373–75 (codified as amended at 20 U.S.C. §§ 1681 through 1688 (2018)).

Title IX provides in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681 (a) (2018).

[7] See *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 634.

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

(Rev. to 2017) § 46b-38b,[8] which was enacted in response to a well-known domestic violence tragedy, the police were required to arrest the grievant and were authorized to seize any weapons in his possession. The facts known to the police at the time fully supported such action. The message that the arbitrator's no consequences award sends to other employees occupying similar positions of trust, not to mention the nonparty stakeholders in this case—students, their parents, and the public at large—is simply untenable. I therefore would affirm the trial court's judgment vacating the award as against public policy.

## I

## FACTS AND PROCEDURAL HISTORY

The following facts, which were either found by the arbitrator or are undisputed, support the conclusion that reinstating the grievant to his former position, without any disciplinary action, violates several explicit, well-defined, and dominant public policies.[9]

---

[8] General Statutes (Rev. to 2017) § 46b-38b provides in relevant part: "(a) Whenever a peace officer determines upon speedy information that a family violence crime has been committed within such officer's jurisdiction, *such officer shall arrest the person . . . suspected of its commission and charge such person . . . with the appropriate crime. . . .* Whenever a peace officer determines that a family violence crime has been committed, such officer may seize any firearm or electronic defense weapon, as defined in section 53a-3, or ammunition at the location where the crime is alleged to have been committed that is in the possession of any person arrested for the commission of such crime or suspected of its commission or that is in plain view. . . ." (Emphasis added.)

[9] In addition to the policies identified by the majority, the plaintiff, the state of Connecticut (state), cites to numerous statutes that evince a policy of preventing intimate partner violence and of regulating conduct among faculty and staff on university campuses. See, e.g., General Statutes § 10a-55m (policies relating to sexual assault, stalking, and intimate partner violence in state higher education system); General Statutes § 10a-55n (policies governing establishment and responsibilities of campus resource team, including Title IX coordinator in state institutions of higher education). The state also relies on the Ethical Principles and Practices in Student Conduct Administration, which requires, inter alia, that college and university administrators overseeing student conduct "avoid private interests, obligations,

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

On the night in question, C left the couple's home in the middle of the night wearing only a bathrobe. Once outside, she dialed 911 and reported that the grievant was suicidal and that he had threatened to kill himself and her. C informed the police that the grievant had held her for hours in the basement of their home accusing her of having an affair and that "she was petrified and concerned about the safety of her children, who were still in the home." C refused to come out of hiding until she was assured that the police were on the scene. The first officer to arrive described her as "frantic" and observed red marks around her neck and scratches on her face.

As the officer approached the house, the grievant opened a second floor window. A next-door neighbor and friend of the grievant heard the officer say to him, " 'what's going on buddy?' " The grievant responded, " 'just come get the kids. I'm not coming out, and I'm not staying in the window.' " The grievant then called the Hartford Police Department and told the dispatcher that the police should remove his children from the home. The dispatcher asked the grievant whether there

and transactions which are, or appear to be, in conflict of interest with the mission, goals, [or] policies . . . of their employing institution" and "demonstrate concern for the legal, social codes, and moral expectations of the communities in which they live and work . . . ." Association for Student Conduct Administration, Ethical Principles and Practices in Student Conduct Administration, pp. 3, 4, available at https://www.theasca.org/assets/pdf/ASCA+Principles+and+Practices+-+Feb+2017/ (last visited May 29, 2024) Finally, the state relies on the Connecticut State Colleges and Universities System Code of Conduct for Regents, Employees and Volunteers, which provides in relevant part that "[a]ll members of the [Connecticut State Colleges and Universities] community have a duty to conduct themselves with integrity, to act with the highest ethical and professional standards, to exercise responsible judgment, and to demonstrate accountability and compliance with state and federal law . . . ." The Connecticut State Colleges and Universities System Code of Conduct for Regents, Employees and Volunteers (October 19, 2017) p. 1, available at https://www.ct.edu/files/pdfs/4.10%20Code%20of%20Conduct%20for%20RegentsEmployeesVolunters.pdf (last visited May 29, 2024).

were any firearms in the home, and he responded that there were several. When asked if he would unload them, the grievant refused to do so. According to the arbitrator, the grievant also "refused to open the door as requested by the officers on the scene and informed the dispatcher that he . . . was unwilling to stay near the window and 'be taken out.' . . . He told [the dispatcher] that he was willing to talk to an officer . . . if they would call his cell phone but was unwilling to 'surrender yet.' He repeatedly told [the dispatcher], 'do not breach this house'. . . ." The grievant informed the dispatcher that "he had a gun on his person" and stated, " 'do not come into this house yet, please sir, right now, I am in a bad place . . . [and] I need to talk to somebody.' " He also warned that "many people will be hurt by his actions." The chief of the Hartford Police Department, several supervisors, and an emergency response team all responded to the scene.

The arbitrator found that, during the standoff, the grievant called his best friend and told him that C "had admitted to him that evening that she was having an affair." "In addition to [making ten] calls to the police, the grievant called a number of other individuals, including his mother (several times), his sister-in-law . . . and his best friend . . . ." In one of the calls to his mother, he informed her "that [C] gets a phone call each evening from another female around 12 a.m." He also called Greg Sneed, the chief of the university's police department.

After the grievant refused to unload his weapons, the police placed barriers around his home and cordoned off the street. Nearby residents were "advised . . . to evacuate to an established safe zone, where a passenger bus was on standby." At some point, the Hartford police chief called Richard Bachoo, the university's chief administrative officer, to advise him of what was happening at the grievant's home. Bachoo drove immedi-

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

ately to the scene. When he arrived, the grievant's mother was standing outside the house, and they had a conversation. Several hours after the incident began, and after numerous conversations with the officer tasked with negotiating the conditions of the grievant's surrender, the grievant agreed to exit his residence. He was then taken by ambulance to a hospital for observation and, thereafter, arrested.

Immediately following this incident, C sought and obtained a temporary restraining order against the grievant. A contested hearing followed two weeks later at which C was extensively cross-examined by the grievant's attorney. This hearing resulted in the issuance of a full protective order, which the grievant did not appeal.[10] The family services report that was issued in

---

[10] A transcript of the protective order hearing was entered in evidence at the arbitration hearing. The trial court that issued the order heard the following testimony from C. On the night in question, after C had put her and the grievant's children to bed, the grievant lured her to the basement door by falsely claiming there was an infestation of ants in the pantry, which was located next to the basement door. When C went to investigate, the grievant "grabbed [her] by [the] throat and . . . the back of [her] hair, and got in [her] face and said, you fucked up in therapy today, bitch. And you know you fucked up. Why do you try to embarrass me? Why? Why are you doing this? If you think I'm a monster, I'm going to show you what a monster I really am. At that point, [the grievant] pulled [C] down the basement steps [and] brought [her] over to [the] laundry utility area. He had [her] by the throat . . . . [C] told him that [she] couldn't breathe, and he responded, good. . . . [She] put [her] thumb in to try . . . [to] get some air . . . [and] started to become a little sick. He . . . let go of [her] throat . . . at [which] point [she] bent over to vomit on the floor. [C] was gagging [at this point], and, while [she] was bent over, [the grievant] said to [her], sounds like you need a little help with that . . . ." It was then that C saw "strips of . . . preripped duct tape hanging from the beams . . . from the ceiling" and "thought that . . . he was going to kill [her]." (Internal quotation marks omitted.) The grievant began asking C many questions. "[They] had . . . been to marriage counseling that morning, where [C] had stated that [she] was going to be filing for a divorce. [They] had been going back and forth with that, with divorce proceedings, and trying to agree to an amicable way to have a divorce. [The grievant] was not agreeable [to] any of it." (Internal quotation marks omitted.) He told C that "he was going to . . . get the truth out of [her] . . . no matter what. So, he began asking . . . [her] whether [she] was a terrible mother . . . if [she] was having an extramarital

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

connection with that judicial proceeding concluded that there was a high risk of recidivism. Following his arrest, the grievant was charged with kidnapping in the first degree, strangulation in the first degree, threatening in the second degree, assault in the third degree, breach of peace in the second degree, and two counts of risk of injury to a child. The charges were dismissed after C declined to cooperate in the criminal prosecution against the grievant. At the arbitration hearing, C testified that she " 'didn't want to bring [her] children to see their father in jail.' "

After the events in question, four students whom the grievant previously had investigated and prosecuted asked to have their cases reopened by the university,

---

affair . . . [and] if [she] . . . had abandoned him. At this point, [the grievant] had his hand around [her] throat again, and he was squeezing. . . . [C] said, you're right. I'm all those horrible things. You're . . . absolutely right. . . . Please let me go. I can't breathe." (Internal quotation marks omitted.) After a while, the grievant called his mother and told her "that it was over, [that] he had gone too far, and that there was no coming back from this. [The grievant's mother] was on speaker phone. She . . . asked [the grievant] to please [leave] the basement and [to] go back upstairs, [and] to let [C] go. . . . [A]fter a while, she . . . convince[d] him to let [C] go and to go upstairs. Once [they] were upstairs . . . [the grievant's mother] asked [C] if she was safe, and [C] said, no." (Internal quotation marks omitted.) When the grievant sat down at the kitchen table, C grabbed her cell phone and ran from the house. After the grievant's attorney finished cross-examining C, the trial court stated: "All right, this is no surprise to anyone. I'm going to enter a full protective order for one year."

The arbitrator found that C's claim that the grievant had been violent toward her during their confrontation was not credible and, on the basis of this finding, reinstated the grievant with full back pay and benefits. The arbitrator based his finding of nonviolence on the following three facts: (1) there was "no mention" in the police report that the investigating officer had observed vomit on the basement floor, (2) the grievant's blood alcohol level was zero when it was tested the morning after the confrontation, and (3) DNA testing of the strips of duct tape that the grievant allegedly had used to bind C's wrists during the assault revealed only C's DNA on one of the strips. The arbitrator therefore credited the grievant's argument that, "if [C's] allegation were true, then his DNA would be on both pieces of the tape. . . . However, since his DNA was found on only one piece of tape, this evidence proves that [C] was lying."

State *v.* Connecticut State University Organization of Administrative Faculty,
AFSCME, Council 4, Local 2836, AFL-CIO

and the parents of another student requested that the grievant have no further contact with their daughter. Prior to terminating the grievant's employment, the university conducted a *Loudermill* hearing[11] at which the grievant " 'spent a lot of time' discrediting [C]." The grievant confirmed this at the arbitration hearing, testifying that "he provided analysis (as a trained investigator) of [C's] 911 call to the police, and her testimony at the hearing for a protective order." The grievant's termination letter stated in relevant part: "[D]uring the *Loudermill* [hearing], you attempted to refute the [u]niversity's evidence by claiming that the entire incident was fabricated by [C] in an attempt to have you 'out of the picture' in both your married life and your children's lives. This was allegedly done so that she could continue a relationship with the person you claim she was having an adulterous affair with . . . . Although you played recordings of interviews, cited dates and times of various phone calls, and showed images of texts and pictures taken by you, you did not produce any evidence mitigating your actions on the night of the incident.

"In your position as [d]irector of [s]tudent [c]onduct, you must adjudicate matters and determine disciplinary consequences in matters involving students who have been alleged to have engaged in serious misconduct, including conduct of a criminal nature. Your behavior on April 24–25, 2018, undermines your ability to carry out the duties and functions of your position."

At the arbitration hearing, the grievant "admitted [to] having a confrontation with [C] in the basement [of his

---

[11] "[A] tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story before termination. . . . The opportunity to present one's side of the story is generally referred to as a *Loudermill* hearing." (Citation omitted; internal quotation marks omitted.) *AFSCME, Council 4, Local 2663* v. *Dept. of Children & Families*, 317 Conn. 238, 243 n.3, 117 A.3d 470 (2015); see also *Cleveland Board of Education* v. *Loudermill*, 470 U.S. 532, 546, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

State *v.* Connecticut State University Organization of Administrative Faculty,
AFSCME, Council 4, Local 2836, AFL-CIO

home] but claimed [that] it was nonviolent. . . . He claimed [that] he was never told why the police were at his home that evening. . . . He alleged that he was being 'set up' and expounded at length about the recent police killings of black men. . . . He testified that his reluctance to leave his home was because he was trying to preserve his life.'' The grievant further claimed that, when he told the police during the standoff "that many people will be hurt by his actions," what he meant was that "many people would be hurt as a result of the breakdown of [his] marriage and [C's] infidelity." Much of the grievant's testimony "delved into the problems of his marriage . . . [in] an attempt to show [C's] lack of truthfulness." The arbitrator found that, "[although the grievant's] testimony was marked at times by outrage and an inclination to infer bad motives for those who were responsible for his prosecution and discharge, the grievant was generally consistent and clearly able to recollect and communicate in great detail about the events that occurred that evening."

The arbitrator concluded that whether the university had just cause to terminate the grievant's employment turned "on the credibility of the two main participants . . . the grievant and [C]. Each has an entirely different version of the events of that evening." The arbitrator was ultimately persuaded by the grievant's claim that the confrontation between him and C was nonviolent, and, on the basis of that finding, the arbitrator concluded that the grievant was not to blame for his standoff with the police.[12] The arbitrator reasoned that the

_____

[12] In his decision, the arbitrator dismissed the university's many concerns regarding the standoff and its impact on the university, stating: "This brings me to the university's claim that the dismissal of the criminal charges does not alter the facts that are not disputed, and which still warrant his discharge, i.e., guns in the house, a refusal to leave the home for a substantial amount of time, his statement during conversations with the police that many people will be hurt, the protective order by the family court, the negative publicity and the resulting requests by students to have their files reviewed, and the fact that children were present in the home. But this argument ignores the fact that the grievant claimed that [C] had made fake allegations. If this

State *v.* Connecticut State University Organization of Administrative Faculty,
AFSCME, Council 4, Local 2836, AFL-CIO

standoff was actually C's fault because, had she not called 911 and falsely accused the grievant of assaulting her, the grievant would not have been put in the position to have to defend himself from the police.[13]

The trial court granted the application of the plaintiff, the state of Connecticut (state), to vacate the arbitration award, observing that it was undisputed that, on the night in question, the grievant had "informed the police that he had loaded firearms in the house, including one on his person, and expressly declined the police request to unload the weapons. He also refused to open the door as requested by the officers on the scene. The standoff continued for hours. All this occurred while his children were in the house." On the basis of these facts, the court concluded that the case implicated "explicit, well-defined, and dominant public policies concerning the protection of children, preserving the peace, preventing interference with police personnel in the performance of their duties, and endangering police officers . . . ." The court then applied the four factors set forth in *Burr Road* for determining whether an arbitration award violates public policy and concluded that each factor weighed in favor of vacating the award in this case.

## II

## LEGAL PRINCIPLES

Although this court undertakes judicial review of arbitral awards in a manner designed to minimize inter-

claim is true, and [C's] charges were false, then the SWAT team's presence, the resulting 'standoff,' and the negative publicity [were] not precipitated by any conduct by the grievant."

[13] The arbitrator's reasoning that an armed resistance to arrest is excusable is itself contrary to public policy. See, e.g., *State* v. *AFSCME, Council 4, Local 387*, 252 Conn. 467, 477, 747 A.2d 480 (2000) ("the award—with its inherent rationalization of conduct . . . violative of statute and regulations—is in itself violative of clear public policy"); see also *Welch Foods, Inc.* v. *General Teamsters Local Union No. 397*, Docket No. 1:19-cv-00322, 2020 WL 7130670, *5 (W.D. Pa. August 6, 2020) (report and recommendation of United States magistrate judge) ("the proposition that [the] [g]rievant

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

ference with an arbitration award, "[w]e . . . submit to higher scrutiny an . . . award that is claimed to be in contravention of public policy. . . . [P]arties cannot expect an arbitration award approving conduct [that] is . . . contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them." (Internal quotation marks omitted.) *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 629–30. "Thus, when a party challenges a consensual arbitral award on the ground that it violates public policy, and [when] that challenge has a legitimate, colorable basis, de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy." (Internal quotation marks omitted.) Id., 630; see also *W. R. Grace & Co.* v. *Local Union 759, International Union of the United Rubber, Cork, Linoleum & Plastic Workers of America*, 461 U.S. 757, 766, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983) ("the question of public policy is ultimately one for resolution by the courts"); *Iowa Electric Light & Power Co.* v. *Local Union 204 of the International Brotherhood of Electrical Workers (AFL-CIO)*, 834 F.2d 1424, 1427 (8th Cir. 1987) ("[b]ecause collective bargaining agreements do not formulate public policy, and arbitrators cannot consider matters not encompassed by the governing agreements, the question of public policy is ultimately one for resolution by the courts" (internal quotation marks omitted)).

In *Burr Road*, this court held that, when determining whether termination of employment is required to vindicate the public policy at issue, a court should focus on four principal factors (*Burr Road* factors): "(1) any guidance offered by the relevant statutes, regulations,

should be reinstated because the female employee 'instigated' the argument sounds disturbingly like excusing the inexcusable because 'she started it' "), adopted, Docket No. 19-322, 2020 WL 5834210 (W.D. Pa. September 30, 2020).

349 Conn. 148 JUNE, 2024 211

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

and other embodiments of the public policy at issue; (2) whether the employment at issue implicates public safety or the public trust; (3) the relative egregiousness of the grievant's conduct; and (4) whether the grievant is incorrigible.''[14] *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 634. We also "clarif[ied] the extent to which the factual findings of the arbitrator control or affect the reviewing court's analysis under each factor''; id., 634; and concluded that they have no effect on the first two factors; id., 635, 637; and minimal effect on the third factor. Id., 638. That is, in determining the relative egregiousness of the grievant's conduct, "[w]e take as our starting point the factual findings of the arbitrator, which are not subject to judicial review." Id. Our determination of whether the conduct in question was egregious, however, "is not restricted to those findings. . . . A broader review is required because the arbitrator, in determining whether there was just cause or some other contractual basis for termination, may focus on [case-specific] considerations such as how the employer has disciplined other employees under similar circumstances. Judicial review, by contrast, necessarily transcends the interests of the parties to the contract, and extends to the protection of other stakeholders and the public at large, who may be adversely impacted by the decision to reinstate the employee. . . . Accordingly, we review de novo the question whether the remedy fashioned by the arbitrator is sufficient to vindicate the public policies at issue." (Citations omitted.) Id., 638–39. As for the fourth factor (incorrigibility), "[b]ecause [the] considerations [that affect our analysis of this issue] are largely fact based and [case-specific], a reviewing court must defer to an arbitrator's assessment—whether express or implied—that a particular

[14] The *Burr Road* factors contain a myriad of subfactors, which I address in connection with my analysis of the four principal factors.

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

employee is unlikely to reoffend if reinstated. . . . [In the absence of] an express finding by the arbitrator, which would be unreviewable, a court will deem an employee incorrigible only when the likelihood of recidivism is plain from the face of the record." (Citations omitted.) Id., 640.

## III

## ANALYSIS

### A

### Statutes, Regulations, and Other Embodiments of Public Policy

"The first [*Burr Road*] factor requires us to consider whether the relevant statutes, regulations, and other manifestations of the public policy at issue themselves recommend or require termination of employment as the sole acceptable remedy for a violation thereof. . . . Put differently, we ask whether the offense committed by the employee involves the sort of conduct the law deems to be inexpiable, or that would expose the employer to substantial liability if it were to reoccur. . . . Whether sources of public policy themselves mandate termination is a question of law subject to plenary review." (Citations omitted.) Id., 634–35. I agree with the trial court that the first *Burr Road* factor weighs in favor of vacating the award, as the grievant's behavior on the night in question involved the sort of conduct the law deems to be inexpiable or that would expose the employer to substantial liability if it were to reoccur while he was at work.

To my knowledge, neither this court nor the Appellate Court has ever had a case in which the statute embodying the public policy at issue mandated termination of employment for persons who violated the statute. Such matters are beyond the purview of most statutes, regardless of their subject matter. Notwithstanding, as the

349 Conn. 148          JUNE, 2024          213

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

majority recognizes, this has not prevented this court and the Appellate Court from concluding that an award violated public policy.[15] See, e.g., *Groton* v. *United Steelworkers of America*, supra, 254 Conn. 46–47; *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 469, 476–78, 747 A.2d 480 (2000); *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, 59 Conn. App. 793, 804–806, 758 A.2d 387, cert. denied, 255 Conn. 905, 762 A.2d 910 (2000); *South Windsor* v. *South Windsor Police Union, Local 1480, Council 15, AFSCME, AFL-CIO*, 41 Conn. App. 649, 654, 677 A.2d 464, cert. denied, 239 Conn. 926, 683 A.2d 22 (1996).

B

Public Safety and Public Trust

The second *Burr Road* factor also weighs in favor of vacating the award, as the grievant's position at the university clearly implicates public safety and the public trust. The majority does not contend otherwise. Instead, the majority minimizes the import and impact of this factor by arguing that "multiple employees of the university who occupied positions of public trust [have] been arrested for off-duty conduct," including the university's president "for impersonating a police officer," and, yet, none of them has had his or her employment terminated. This court has no knowledge of the circumstances of those cases, including whether any discipline was imposed in lieu of termination. Even if we did, our case law establishes that, although this type of information may be relevant to an *arbitrator* in determining just cause and an appropriate penalty, it is not relevant to this court's public policy analysis. As we stated

---

[15] This court noted in *Burr Road* that, although the public policy ground for vacatur is a narrow one and appeals involving such challenges are brought to us infrequently, in one half of them, we held that reinstatement of the employee violated a clear public policy. See *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 632.

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

in *Burr Road*, de novo review is applied in cases such as the present one precisely "because the arbitrator, in determining whether there was just cause or some other contractual basis for termination, may focus on [case-specific] considerations such as how the employer has disciplined other employees under similar circumstances. Judicial review, by contrast, necessarily transcends the interests of the parties to the contract, and extends to the protection of other stakeholders and the public at large, who may be adversely impacted by the decision to reinstate the employee." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 639; see also C. Fox & B. Gruhn, "Toward a Principled Public Policy Standard: Judicial Review of Arbitrators' Decisions," 1989 Det. C. L. Rev. 863, 871–72 (1989) ("The arbitrator has no superior knowledge of public policy. Far from being an expert on public policy, an arbitrator [is precluded from] even consider[ing] public policy issues. . . . By definition, arbitral awards that impact public policies affect persons not party to the contract. The public has not contracted for an arbitrator's powers; it should not be held hostage to [his] whims. [Because] the arbitrator may not protect these extra-contractual interests, it would be inequitable to prevent the courts from doing so." (Footnotes omitted.)). These stakeholders "were not party to the collective bargaining agreement, nor were they party to the arbitration clause. When public policies protecting the general public are threatened by an arbitrator's decision, the [general rule] 'they bargained for it, they'll have to live with it' rationale is inapplicable." C. Fox & B. Gruhn, supra, 890.

## C

### Egregiousness

In assessing the third *Burr Road* factor, the relative egregiousness of the grievant's offense, *Burr Road* directs

State *v.* Connecticut State University Organization of Administrative Faculty,
AFSCME, Council 4, Local 2836, AFL-CIO

us to consider a multitude of subfactors, including "(1) the severity of the harms imposed and risks created by the grievant's conduct; (2) whether that conduct strikes at the core or falls on the periphery of the relevant public policy; (3) the intent of the grievant with respect to the offending conduct and the public policy at issue; (4) whether reinstating the grievant would send an unacceptable message to the public or to other employees regarding the conduct in question; (5) the potential impact of the grievant's conduct on customers/clients and other nonparties to the employment contract; (6) whether the misconduct occurred during the performance of official duties; and (7) whether the award reinstating the employee is founded on the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalance the public policy at issue." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 638. In the present case, all but two of these subfactors weigh in favor of vacating the award.

As the trial court stated, the grievant's conduct "[struck] at the core, not the periphery of the public policies" at issue and had "a direct connection to the responsibilities of [his position]." This can hardly be disputed. Indeed, the nexus between the grievant's conduct, his job duties, and the public policies at issue could not be any starker.[16] The severity of the risks created by the grievant's armed standoff with the police, which required the police to evacuate the grievant's street in

[16] This case bears no resemblance to cases in which the employee held no position of trust and/or the misconduct was unrelated to the duties of the employee's job. See *State* v. *Connecticut Employees Union Independent*, supra, 322 Conn. 734–35 (when hospital maintenance worker's employment was terminated after he was caught smoking marijuana in hospital parking lot, "[t]he arbitrator [correctly] concluded that termination of the grievant's employment was unwarranted, but nevertheless imposed a severe punishment on the grievant, relying, in part, on mitigating circumstances, such as his positive work record, and competing policy aims, such as progressive discipline and the promotion of rehabilitation").

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

the middle of the night, are equally self-evident, as is the message that his unconditional reinstatement sends to the community. As the trial court stated, the message it sends is "that it is appropriate for a university administrator charged with the public trust of investigating and enforcing the code of student conduct to take the law into his own hands . . . to refuse to unload weapons, and [to] maintain a lengthy standoff with [the] police. The recipients of such a message would include students, parents, other staff, and the public."[17]

---

[17] The majority asserts that, "[i]nstead of relying on the factual findings of the arbitrator, as we must, the dissent makes numerous factual inferences and relies on speculation to reach its conclusion. For instance, the dissent asserts that '[t]he message that the . . . [arbitration] award sends to other employees occupying similar positions of trust, not to mention the nonparty stakeholders in this case—students, their parents, and the public at large— is simply untenable.' " The majority further asserts that "[t]he dissent's entire position rests on its disagreement with the remedy chosen by the arbitrator." The majority's criticism in this regard is unfounded.

A reviewing court does not engage in impermissible fact-finding or speculation when it considers "whether reinstating the grievant would send an unacceptable message to the public" and/or "the potential impact of the grievant's conduct on customers/clients and other nonparties to the employment contract . . . ." *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn 638. The court is simply doing its job under *Burr Road*, which expressly requires it to consider these and other factors de novo. See, e.g., *Bridgeport Board of Education* v. *NAGE, Local RI-200*, 160 Conn. App. 482, 502, 125 A.3d 658 (2015) (termination of employee's employment was warranted because "[a] lesser sanction would send an unacceptable message to the public and other employees that a threat by an employee to commit random shootings in an educational setting is permissible or excusable"). Indeed, the case law and treatises make clear that the arbitrator is not permitted to consider these questions when deciding whether there was just cause for termination, and, therefore, there is no reason for there to be arbitral findings with respect thereto. See 20 R. Lord, Williston on Contracts (4th Ed. 2024) § 56:111 ("[b]ecause collective bargaining agreements do not formulate public policy, and arbitrators cannot consider matters not encompassed by governing agreements, the question of whether an arbitration award violates public policy is ultimately one for resolution by the courts" (footnote omitted)); Fox & B. Gruhn, supra, 1989 Det. C. L. Rev. 871–72 ("Far from being an expert on public policy, an arbitrator [is precluded from] even consider[ing] public policy issues. . . . By definition, arbitral awards that impact public policies affect persons not party to the contract." (Footnote omitted.)). *Burr Road* itself expressly "clarif[ied] the extent to which the factual findings of the arbitrator control or affect the reviewing court's analysis under each

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

As for "the intent of the grievant with respect to the offending conduct and the public policy at issue"; *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 638; the record makes clear that the grievant intended his actions. I note in this regard the arbitrator's finding that "[t]here was one aspect of [the grievant's] testimony that was substantially contradicted by other evidence. [His friend Robert] DelPomo testified that he had a conversation with the grievant sometime after 1 a.m. In that conversation, the grievant told DelPomo that he didn't know why the police were at his home. However, the grievant admitted that he had called the police at 12:12 a.m. The recording of that conversation reveals that the grievant clearly knew why the police were at his home." The arbitrator further found that the grievant refused to open his door, refused to unload his weapons, and repeatedly warned the police "not [to] breach this house . . . ."[18] (Internal quotation marks omitted.) Given these findings, as well as the grievant's statement that he was not ready to surrender, there can be no question but that the grievant intended to interfere with the police and to resist arrest. See General Statutes § 53a-167a (a) ("[a] person is guilty of interfering with an officer when such person obstructs, resists . . . [or] hinders . . . any peace officer . . . in the performance of such peace officer's . . . duties").

[*Burr Road*] factor"; *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 634; and concluded that our determination of whether the conduct in question was egregious "*is not restricted to* [*the arbitrator's*] *findings.*" (Emphasis added.) Id., 638. The majority does not cite a single case, and my research has found none, to suggest that these questions of public policy, which are expressly reserved for the court, are to be answered by the arbitrator in the first instance.

[18] The police ultimately recovered "eleven firearms, several firearm magazines, one BB gun, [and] copious amounts of ammunition in various calibers . . . ." Nine of the firearms were registered to the grievant. Two of them were unregistered.

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

The next subfactor we consider in evaluating whether misconduct was egregious is whether it occurred during the performance of the employee's official duties. As the majority notes, most of the cases that have come before this court or the Appellate Court have involved on-the-job misconduct. Although this is an important factor, it is not a dispositive one. See, e.g., *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, supra, 59 Conn. App. 802–803 ("we cannot accept . . . that the commission of illegal activity inside or outside of work is a dispositive factor for determining the presence or absence of a public policy [violation]"). As the arbitrator noted in his decision, "[t]here is no shortage of arbitration decisions upholding termination premised on off-duty criminal conduct. The pivotal factor in off-duty misconduct cases is the nexus between the employee conduct and the employer's legitimate interests in an effective business operation." (Internal quotation marks omitted.)

This is so because "[i]mproper conduct in an employee's personal life can have various effects on the employee's workplace. [Thus, we must] consider in cases such as these the nature of the improper act, its severity and the kind of the work the employee performs." *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, supra, 59 Conn. App. 803; see also *AFSCME, Council 4, Local 2663* v. *Dept. of Children & Families*, 317 Conn. 238, 255–56, 117 A.3d 470 (2015) ("To the extent that the union contends that the arbitrator exceeded her authority in relying on [the employee's] off duty conduct, we disagree. . . . The collective bargaining agreement did not . . . limit just cause for dismissal to conduct on the job. . . . Nor did it specify that any off duty misconduct must impair the employee's ability to perform her particular job responsibilities, as opposed to [impairing] the [employer's] ability

349 Conn. 148 JUNE, 2024 219
State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

to perform its mission generally.'' (Citation omitted; footnote omitted.)).

I can perceive of no reason why off-duty misconduct that strikes at the core of the employee's job duties, as it did here, should not support a finding of egregiousness. In *South Windsor* v. *South Windsor Police Union, Local 1480, Council 15, AFSCME, AFL-CIO*, supra, 41 Conn. App. 649, the Appellate Court held that an arbitration award reinstating a police officer who intentionally revealed the identity of a confidential informant violated public policy. Id., 654. I have no doubt that the result would have been the same if the officer had disclosed the informant's identity outside of work. There will be cases in which the nexus between misconduct and the employee's job is so manifest that it simply cannot matter when or where it occurs. In my view, this is such a case.

Lastly, we must consider whether the award reinstating the grievant with no discipline whatsoever is founded on the arbitrator's determination that mitigating circumstances, or other policy considerations, counterbalanced the public policy at issue. As the majority notes, ''[t]he arbitrator credited the grievant's testimony about the recent killings of Black men [by the police] and his resultant fear for his safety'' and that ''he felt [that] his life was in danger and [he] was unwilling to exit until he felt confident about his safety.'' (Internal quotation marks omitted.) Contrary to the majority, I cannot conclude that the grievant's reasonable fear is sufficient to overcome the conclusion that his reinstatement, without any sanction, violates public policy. See *Philadelphia Housing Authority* v. *AFSCME, District Council 33, Local 934*, supra, 617 Pa. 83 (''a holding that the arbitrator's award [imposing no sanction] did not violate a well-defined, explicit and dominant public policy would construe the public policy exception so narrowly that it would be, as a practical matter, completely

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

negated''); id., 82–83 (''[t]he absurd award here [imposing no sanction] makes a mockery of the dominant public policy . . . by rendering public employers powerless to take appropriate actions to vindicate a strong public policy'').

In reaching this conclusion, I am mindful that this court is not bound by an arbitrator's findings of mitigation. See, e.g., *Burr Road Operating Co. II, LLC* v. *New England Health Care Employees Union, District 1199*, supra, 316 Conn. 638–39; see also *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 479 (*Peters, J.*, concurring) (''this court is not bound by arbitral finding of mitigating circumstances in light of the egregious nature of the employee's conduct''). We also have repeatedly eschewed the idea ''that stress, or poor judgment, or other factors, somehow [render egregious behavior] permissible or excusable.'' (Internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 477; see id., 469, 471, 477–78 (vacating award reinstating corrections officer who committed harassment in second degree notwithstanding arbitrator's mitigation findings and imposition of sixty day unpaid suspension); see also *Bridgeport Board of Education* v. *NAGE, Local RI-200*, 160 Conn. App. 482, 486–88, 502, 505, 125 A.3d 658 (2015) (vacating award reinstating school custodian who threatened violence in letter to his superiors notwithstanding arbitrator's finding that letter was '' 'cry for help' '' and imposition of unpaid suspension).

In reaching a contrary conclusion, the majority conflates two distinct concerns. There can be no serious dispute as to the disparate treatment that people of color, especially Black men, have received at the hands of the police, resulting in what this court has described as a justified fear ''that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence.'' (Inter-

nal quotation marks omitted.) *State* v. *Edmonds*, 323 Conn. 34, 74, 145 A.3d 861 (2016). These very real concerns, however, cannot excuse a refusal to cooperate with law enforcement officers, which in turn may result in an escalation of the police response, as it did in the present case. Even more to the point, this court cannot condone an hours long armed resistance to arrest, even if an individual feared for his safety and believed that he was innocent of any crime.

D

Incorrigibility

The final *Burr Road* factor, incorrigibility, requires us to consider, inter alia, whether the grievant "has demonstrated a willingness to change and an amenability to discipline," "has exhibited remorse and attempted to make restitution for past offenses," and "is likely to benefit from additional training and guidance." *Burr Road Operating Co. II*, *LLC* v. *New England Health Care Employees Union*, *District 1199*, supra, 316 Conn. 639–40. Although the arbitrator made few findings with respect to this issue, one searches the record in vain for any sign that the grievant felt the slightest remorse or responsibility for what had occurred. To the contrary, as the arbitrator noted, and the transcripts, pleadings, exhibits, and memoranda of law reveal, the grievant accepts no responsibility and has shown no remorse. The grievant's defense at both the *Loudermill* hearing and the arbitration proceedings, which were separated in time by nearly two years, focused on C's "lack of truthfulness," her alleged "adulterous affair," and how he was "set up," not only by C, who he claimed "fabricated" her charges of domestic abuse, but by the university, the police, and the prosecutor as well. On the basis of the record before us, I would conclude that the

222                    JUNE, 2024                    349 Conn. 148

State *v.* Connecticut State University Organization of Administrative Faculty, AFSCME, Council 4, Local 2836, AFL-CIO

grievant is incorrigible within the meaning of *Burr Road*.[19]

## IV

## CONCLUSION

In sum, although there is no requirement that all four *Burr Road* factors weigh in favor of vacating the arbitral award on public policy grounds; see, e.g., *New Haven* v. *AFSCME, Council 4, Local 3144*, supra, 338 Conn. 186–87; they do so in this case. The nexus between the public policies at issue, the grievant's job responsibilities, and the grievant's misconduct is unmistakable and as compelling as in any case in which this court or the Appellate Court has determined that reinstatement violated public policy. Moreover, the present case stands out as being the only one of its kind in which the arbitrator imposed no penalty at all for behavior antithetical to the employee's job duties and the employer's stated mission, goals, and policies. I therefore cannot conclude that the award vindicates the important public policies at issue. Accordingly, I would affirm the trial court's judgment vacating the award as against public policy.[20]

---

[19] The majority concludes that the grievant is not incorrigible because, following his arrest, he participated in a domestic violence offender program. The program, however, was not a condition of the grievant's reinstatement or otherwise part of the arbitral award. The director of that program, Charles Frazier, who testified on behalf of the grievant at the arbitration hearing, stated that he was unsure whether the grievant's participation in the program was court-ordered or whether it was undertaken on the advice of counsel given the seriousness of the charges the grievant was facing at the time of his arrest. Whatever the reason for the grievant's participation in the program—the arbitrator made no findings with respect to this issue—it does not alter the fact of the grievant's unrepentant stance at the *Loudermill* hearing and during the arbitration proceedings.

[20] See General Statutes § 52-418 (b) ("if an award issued pursuant to a grievance taken under a collective bargaining agreement is vacated the court or judge shall direct a rehearing unless either party affirmatively pleads and the court or judge determines that there is no issue in dispute"); *AFSCME, Council 4, Local 1565* v. *Dept. of Correction*, 298 Conn. 824, 852, 6 A.3d 1142 (2010) (when award issued pursuant to grievance taken under collective bargaining agreement is vacated on public policy grounds, "[the court must] remand the case to the arbitrator for further proceedings pursuant to § 52-418 (b)").